SABATINO, P.J.A.D.
*219 The State's appeal in this case calls for us to interpret and apply the Overdose Prevention Act (the "OPA" or "the Act"), N.J.S.A. 2C:35-30 to -31; N.J.S.A. 24:6J-1 to -6. The OPA, which the Legislature enacted in 2013 and slightly amended in 2015, has yet to be discussed in a published opinion.
Among other things, the statute confers immunity upon two categories of qualifying persons from being "arrested, charged, prosecuted, or convicted" for certain enumerated possessory drug offenses. The immunity covers persons: (1) who act in good faith to request medical assistance for individuals perceived to be experiencing a "drug overdose," as defined by N.J.S.A. 24:6J-3 ; or (2) who experience a drug overdose and have been the subject of such a good faith request for medical assistance by others, or who have sought such assistance themselves. See N.J.S.A. 2C:35-30 (granting immunity for the persons making such requests for assistance); N.J.S.A. 2C:35-31 (granting immunity for the persons who are the subject of such eligible requests).
The OPA is intended to save lives by "encouraging witnesses and victims of drug overdoses to seek medical assistance." N.J.S.A. 24:6J-2. The Act specifically *1176 aims to promote the wider prescription and administration of opioid antidote drugs for the benefit of persons who are at risk of an overdose, as well as their family members and peers. Ibid.
The trial court in this case applied the Act's immunity in granting a defendant's motion to dismiss an indictment charging *220 him with third-degree possession of a controlled dangerous substance ("CDS"). The limited factual record shows that a police officer responded to a report of a person, who was allegedly described by an unidentified third party as "intoxicated" in the waiting area of a train station. The officer found a person lying on the floor of the station. The officer observed the person nodding in and out of consciousness when asked questions, being unaware of his location, and displaying "pinpoint" eyes. Recognizing these characteristics were indicative of the effects of heroin use, the officer summoned emergency medical technicians ("EMTs").
The EMTs transported the person, later identified as defendant, from the train station to a local hospital. Defendant was diagnosed there with an intentional drug overdose, but he survived after receiving treatment. Hospital staff found several used and unused bags of a powdery substance in defendant's backpack. The substance was turned over to law enforcement and shown by field testing to be heroin. A grand jury thereafter indicted defendant for the heroin possession offense. He moved to dismiss the indictment, invoking the OPA.
After considering the written submissions and hearing oral argument, the trial court issued a written opinion finding that the circumstances qualified for immunity under the Act. The court concluded that a "good faith request for medical assistance" had been made under N.J.S.A. 2C:35-31, involving a person that "a layperson would reasonably believe" was exhibiting an "acute condition" indicative of a "drug overdose," as defined in N.J.S.A. 24:6J-3.
On appeal, the State argues that the trial court erred in dismissing the indictment under the OPA, contending that the Act does not immunize situations it characterizes as mere "intoxication" from drug use. Defendant counters that the Act contains no such caveat or limitation, and that the record in this case amply supports the trial court's application of the immunity.
*221 For the reasons that follow, we hold that the broad definition of a "drug overdose" that the Legislature chose to adopt in N.J.S.A. 24:6J-3 does not turn on concepts of "intoxication." Instead, the OPA immunity hinges upon whether the discrete elements specified within that definition are met.
A defendant may raise the immunity at any stage of the criminal process from the time of arrest through conviction. The defendant bears the burden of establishing the defense applies by a preponderance of the evidence. In certain exceptional situations where the facts known to the State patently appear to support the OPA's exculpatory immunity, the State may have a duty to advise grand jurors of those pertinent facts and the statute's immunity provisions, in order to avoid a qualified defendant from being "charged" in contravention of N.J.S.A. 2C:35-31.[2]
*1177 As our opinion acknowledges, sometimes there can be genuine issues of material fact as to whether the elements of the immunity, including the definition of a "drug overdose" under N.J.S.A. 24:6J-3, are satisfied. The sparse record in this case is inadequate for us to resolve those factual issues. Among other things, the record is vague and unclear regarding the perceived severity of defendant's condition when he was observed at the train station, and whether a layperson would have reasonably believed he was then suffering from an "acute condition" caused by drug consumption that required medical assistance. Consequently, we vacate without prejudice the trial court's dismissal order and remand for an evidentiary hearing.
*222 I.
The History, Objectives, and Text of the OPA
In adopting the OPA in 2013, the Legislature declared the following objectives:
The Legislature finds and declares that encouraging witnesses and victims of drug overdoses to seek medical assistance saves lives and is in the best interests of the citizens of this State and, in instances where evidence was obtained as a result of seeking of medical assistance, these witnesses and victims should be protected from arrest, charge, prosecution, conviction, and revocation of parole or probation for possession or use of illegal drugs. Additionally, naloxone is an inexpensive and easily administered antidote to an opioid overdose. Encouraging the wider prescription and distribution of naloxone or similarly acting drugs to those at risk for an opioid overdose, or to members of their families or peers, would reduce the number of opioid overdose deaths and be in the best interests of the citizens of this State. It is not the intent of the Legislature to protect individuals from arrest, prosecution or conviction for other criminal offenses, including engaging in drug trafficking, nor is it the intent of the Legislature to in any way modify or restrict the current duty and authority of law enforcement and emergency responders at the scene of a medical emergency or a crime scene, including the authority to investigate and secure the scene.
[ N.J.S.A. 24:6J-2 (emphasis added).]
The relevant portions of the OPA granting immunity, codified at N.J.S.A. 2C:35-30 and -31, largely originated from an earlier bill known as the Good Samaritan Emergency Response Act ("GSERA"), which was introduced in 2012. The proposed GSERA bill was similar in many respects to what became the enacted version of OPA, but there were several differences.[3]
Governor Christie conditionally vetoed the first reprint of the GSERA bill, observing that a more "comprehensive" approach to the drug overdose problem was warranted:
*223 This bill as drafted ... fails to carefully consider all the interests that *1178 must be balanced when crafting immunities to the protections provided in our criminal laws. Thus, although the bill addresses perceived impediments to reporting drug overdoses, the proposal fails to consider the existing approaches to deterrence, public safety, prevention of violence, and the many social problems that accompany the rampant proliferation of drug distribution and use. Accordingly, the more reasoned and practical approach is to address these issues comprehensively and holistically, rather than by simply removing criminal liability and exposure to punitive measures.
Therefore, I return this bill with my recommendations to direct the Division of Criminal Justice within the Department of Law and Public Safety to study the issue of drug overdose reporting, and to provide my Administration and the Legislature with recommendations on a comprehensive approach to addressing this issue.
[Governor's Conditional Veto Statement to A. 578 (Oct. 11, 2012).]
Thereafter, the Governor conditionally vetoed the first reprint of the OPA, recommending that provisions within GSERA be merged into the OPA. Governor's Conditional Veto Statement to S. 2082 (Apr. 29, 2013).[4]
In several respects not germane to the present appeal, the scope of the immunity narrowed somewhat during the legislative process. Notably, however, the broad statutory definition of a "drug overdose"-a critical aspect of this case-remained the same within the successive drafts of GSERA and the OPA.
As enacted by the Legislature following the Governor's conditional veto, the OPA established two key immunity provisions. One was codified in N.J.S.A. 2C:35-30 for a qualifying person who "in good faith" seeks medical assistance for someone experiencing a drug overdose. A second immunity was codified in N.J.S.A. 2C:35-31, extending to a person who "experiences a drug overdose and who seeks medical assistance or is the subject of a good faith request for medical assistance" pursuant to the statute. Both immunity provisions declare that such qualifying persons "shall *224 not be: ... arrested, charged, prosecuted, or convicted" of a listed series of enumerated offenses. N.J.S.A. 2C:35-30(a) and -31(a).[5]
Without repeating in detail the entire list here, the immunized offenses include "being under the influence of, or failing to make lawful disposition of, a [CDS] or [CDS] analog," as is otherwise proscribed by subsections a, b, or c of N.J.S.A. 2C:35-10. See N.J.S.A. 2C:35-30(a)(1) and -31(a)(1). Defendant in this case is charged with such a simple possessory offense.
The list also includes offenses for inhaling fumes of a toxic chemical; attempting to obtain or possessing prescription drug legends; acquiring CDS by fraudulent means; unlawfully possessing a CDS that was lawfully prescribed or dispensed; using *1179 or possessing with intent to use certain drug paraphernalia, needles, or syringes; and the revocation of certain parole or probation conditions. See N.J.S.A. 2C:35-30(a)(2) to (7) and -31(a)(2) to (7). The statute does not immunize offenses omitted from the enumerated list, for it is "not the intent of the Legislature to protect individuals from arrest, prosecution or conviction for other criminal offenses, including engaging in drug trafficking ...." N.J.S.A. 24:6J-2 (emphasis added).
Each of the immunity provisions explicitly limits the statute's protection to criminal charges that are based on evidence "obtained as a result of the seeking of medical assistance." N.J.S.A. 2C:35-30(b)(2) and -31(b). Hence, incriminating evidence that law enforcement officials obtain by other means, such as the fruits of a search warrant or a constitutional warrantless search, unconnected from someone's attempt to seek medical assistance *225 for an individual perceived to be experiencing a drug overdose, is beyond the immunity's reach.
The Definition of "Drug Overdose" Within N.J.S.A. 24:6J-3
The pivotal concept for the present case (and no doubt others that arise under the OPA) is the wording of the Legislature's definition in N.J.S.A. 24:6J-3 of a "drug overdose," a term which is cross-referenced in the immunity provisions of N.J.S.A. 2C:35-30 and -31. According to that definition, a drug overdose is
an acute condition including, but not limited to, physical illness, coma, mania, hysteria, or death resulting from the consumption or use of a controlled dangerous substance or another substance with which a controlled dangerous substance was combined and that a layperson would reasonably believe to require medical assistance.
[ N.J.S.A. 24:6J-3 (emphasis added).]
Meanwhile, the term "medical assistance" is defined in the OPA to encompass
professional medical services that are provided to a person experiencing a drug overdose by a health care practitioner, acting within the practitioner's scope of professional practice, including professional medical services that are mobilized through telephone contact with the 911 telephone emergency service.[6 ]
[Ibid. ]
The judicial interpretation of the term "drug overdose" within the OPA must focus on the definition provided in the words of the statute itself. It is well settled that the text of the enactment is the appropriate starting point-and often the ending point-for the judicial process of statutory interpretation. "The *226 Legislature's intent is the paramount goal when interpreting a statute and, generally, the best indicator of that intent is the statutory language." DiProspero v. Penn, 183 N.J. 477, 492, 874 A.2d 1039 (2005) (citing Frugis v. Bracigliano, 177 N.J. 250, 280, 827 A.2d 1040 (2003) ). A court should "ascribe to the statutory *1180 words their ordinary meaning and significance, and read them in context with related provisions so as to give sense to the legislation as a whole." Ibid. (internal citations omitted). If a statute's plain language "clearly reveals the Legislature's intent, the inquiry is over." State v. Harper, 229 N.J. 228, 237, 160 A.3d 1281 (2017) (citing DiProspero, 183 N.J. at 492, 874 A.2d 1039 ). We only consider extrinsic sources, such as legislative history, if the words of the statute are "ambiguous," or if "a literal reading of the law would lead to absurd results." Ibid. (citations omitted). Courts must not "disregard plain statutory language to replace it with an unenacted legislative intent ...." Dempsey v. Mastropasqua, 242 N.J. Super. 234, 238, 576 A.2d 335 (App. Div. 1990).
Even if we were to regard the Legislature's definition of a "drug overdose" in N.J.S.A. 24:6J-3 as ambiguous, or as being somehow prone to yield absurd outcomes, extrinsic sources concerning the provision are not particularly informative. The available legislative history does not provide any direct or explicit insight concerning the definition that the Legislature crafted. We have not found, nor been furnished with, written legislative reports or materials that specifically address the intended meaning of the term, beyond the words of the statute itself. In addition, we have not been able to glean any illuminating commentary from the audio recordings of the legislative sessions on the OPA that took place in the State Senate and General Assembly.
Linguistically unpacked, the rather lengthy definition of a drug overdose within N.J.S.A. 24:6J-3 contains the following components.
First, the person in question must exhibit an "acute condition." The text of the definition tells us that such an "acute condition" includes, but is not limited to, "physical illness, coma, *227 mania, hysteria, or death ...." N.J.S.A. 24:6J-3. The adjective "acute" connotes severity. See Stedman's Medical Dictionary 23 (28th ed. 2006) (defining the term "acute" to refer to "a health effect, usually of rapid onset, brief, not prolonged; sometimes loosely used to mean severe" and "exposure, brief, intense, short-term; sometimes specifically referring to brief exposure of high intensity"). The condition cannot be mild or inconsequential.
On the other hand, the condition need not be so severe to produce a coma or death. Nor does it have to involve mania or hysteria. Otherwise, we would be improperly ignoring the Legislature's illustrative inclusion of the broader term "physical illness." See State v. Malik, 365 N.J. Super. 267, 278, 839 A.2d 67 (App. Div. 2003) (instructing that codified provisions should be construed in a manner that imbues meaning to all of their provisions); see also State v. Hyland, 452 N.J. Super. 372, 388-89, 174 A.3d 538 (App. Div. 2017).
Second, the statutory definition's requirement of an "acute condition" is qualified by a causation aspect. Specifically, the acute condition must be "resulting from the consumption or use of a [CDS] or another substance with which a [CDS] was combined ...." N.J.S.A. 24:6J-3 (emphasis added). So, for example, a person possessing narcotics who appears to be acutely ill from a knife wound, a burst appendix, or a fracture would not trigger the immunity. Nor would a drug user or possessor who has consumed CDS in the past, but who is now experiencing an acute condition perceived to result from another cause.
Third, the acute condition must be one "that a layperson would reasonably believe to require medical assistance." Ibid. (emphasis added). Several of these words, *1181 which we have underscored for emphasis, convey important facets.
By choosing to define the immunity in terms of the perception of a layperson-rather than of a person with specialized knowledge about opioids such as a physician, nurse, EMT, paramedic, or many law enforcement officers-the Legislature *228 made clear that it did not want laypersons, when they request medical assistance for someone who seems to be overdosing, to be held to the rigorous standards of an expert's superior knowledge.
A layperson (formerly described as a "layman") is defined in a leading dictionary as someone who is "not a member of a particular profession or specialty." Webster's II New College Dictionary, 623 (2nd ed. 1999). A layperson is also "not an expert in some branch of knowledge or art[.]" Webster's Third New International Dictionary, 1281 (1981). See, e.g., N.J.R.E. 702 (defining, in the analogous context of our rules of evidence, an expert as someone having specialized knowledge, skill, experience, training, or education).
Expert knowledge by the party who pursues medical assistance therefore is not required to trigger the OPA's immunity. Nor is such expert knowledge dispositive. The pertinent inquiry is not what an expert would conclude about the subject's condition. Rather, the nature and urgency of the situation is to be viewed through the eyes of an average person. Such an approach is consistent with the stated objective of the Act: to encourage people to get medical attention for acutely ill persons, or for themselves, lest they may die of an overdose. See N.J.S.A. 24:6J-2. The statute aims to incentivize third parties who perceive another individual's apparent overdose, or who think they are personally suffering one, to err on the side of caution and get immediate medical help.
This lay-oriented approach is echoed by N.J.S.A. 24:6J-3's requirement that the person reporting the situation possess a "reasonable belief" the subject requires medical attention. This phrasing invokes the well-established legal notion of the objective "reasonable person" embodied in tort law and other contexts. The call for medical help cannot be fanciful or far-fetched. It must reasonably appear to be "required" under the circumstances presented.
*229 Moreover, the call for medical assistance must be pursued in "good faith" to qualify for the immunity. N.J.S.A. 2C:35-30(a) and -31(a). For instance, a "bad faith" pretextual attempt to exploit the OPA's immunity by taking an illegal drug possessor who is fearful of being prosecuted to a hospital emergency room, even though he or she does not genuinely appear to be acutely ill, will not succeed.
Having dissected the statute in this manner, it becomes apparent that the Legislature crafted the definition of a drug overdose within the OPA rather carefully, and with the policy objectives of the law in mind. To be sure, the statute could be even clearer in some respects, such as providing a more detailed explication of what forms of "physical illness" qualify as an "acute condition." Would, say, a bad stomach ache or an intense headache caused by drug use suffice? Perhaps not, but ultimately such questions may turn on the degree of severity (i.e., acuteness) presented by the facts. We need not resolve in this opinion all of the theoretical possibilities. All we can do here is simply identify and attempt to explain the core elements of the law. If the Legislature wishes to provide further clarity, it can surely enact amendments to do so.
The State's "Mere Intoxication" Argument
The State argues that the definition of a "drug overdose" within *1182 N.J.S.A. 24:6J-3 should be construed to exclude situations in which the subject is only "intoxicated." The State expresses concerns that if we do not impose such a gloss upon the statute, the immunities of the OPA will be applied excessively, perhaps even abused by cunning offenders, and thereby too many legitimate prosecutions for drug offenses will be stymied.
Although we appreciate the State's concerns, we respectfully decline its invitation to inject a concept into the Act that is not contained within its text. The Act's definition does not anywhere refer to "intoxication," or even a synonym for that term. Commonly, intoxication, a term which appears in drunk driving laws and other contexts, connotes a person's impairment from an ingested substance that occurs to such a degree that he or she cannot *230 perform certain physical tasks or which substantially interferes with his or her cognition or communication. See, e.g., State v. R.T., 205 N.J. 493, 505, 16 A.3d 365 (2011) (Long, J., concurring) ("Intoxication under our law means a disturbance of mental or physical capacities resulting from the introduction of substances into the body."); see also N.J.S.A. 39:4-50 (defining the offense of driving while intoxicated, with reference to specific levels of blood alcohol concentration and other factors).
In everyday parlance, a person who is "intoxicated" is typically understood to be someone who exhibits slurred speech, loss of balance, trouble speaking with or understanding others, and other irregularities. However, in some situations, a person may be so severely intoxicated so as to be in danger of death from alcohol poisoning or some other grave toxically-induced medical harm.
Our point is that the term "intoxication" has a wide range of meanings, depending upon the context. We discern no reason to read that imprecise term into the multi-part definition of drug overdose already expressed in N.J.S.A. 24:6J-3. We decline to engraft upon the statute an unstated exception for so-called "mere intoxication" cases. If the Legislature wanted to import into the OPA concepts of intoxication from N.J.S.A. 39:4-50 or other contexts, it had the ability to do so.
Moreover, the State's policy concerns about the possible misuse or over-application of the OPA's immunity can largely be addressed by applying the existing terms of the statute, including the requirements for an "acute" condition; a layperson's "reasonable" perception that the subject "requires" medical assistance; and the mandate that the call for assistance be pursued in "good faith."
We do not share the State's apprehension that the application of the layperson standard, as expressed in the statute, will lead to illogical or undesirable consequences in situations where, as here, the subject who may be overdosing is encountered by a law enforcement officer. We recognize that officers, because of their special training, often will have a more informed basis to assess if *231 a subject is actually overdosing. We also are mindful that an officer may be obligated, because of police protocols or situational factors, to arrange for a person to be taken to a medical facility as a precautionary measure, or by his or her request, even though the person is not actually in an "acute condition" caused by CDS ingestion that "requires" medical assistance.
The bare fact that an officer calls for medical assistance does not mean that the OPA's immunity automatically applies. Instead, a deeper factual analysis of the circumstances might lead to an opposite conclusion. As the Act's declaration of purpose instructs, the intent of the Legislature is not "to in any way modify or restrict *1183 the current duty and authority of law enforcement and emergency responders at the scene of a medical emergency or a crime scene, including the authority to investigate and secure the scene." N.J.S.A. 24:6J-2.
Law enforcement officers, EMTs, and other first responders should continue to carry out their duties in the ordinary course, while courts faced with OPA immunity arguments should apply the terms of the statute to the fact patterns presented on a case-by-case basis. We dispel here any myth that, "If you get an officer who encounters you to call in the EMTs, that means you are automatically immune under the OPA." Not so.
II.
Having addressed these substantive facets of the OPA, we now turn to a few procedural questions, hoping to provide some guidance in this opinion of first impression. In particular, we address concerns about the appropriate time for the statutory immunity to be raised and resolved, and also how to best deal with material questions of fact that bear upon its applicability. These concerns were explored at some length in oral argument before the trial court and this court, and we appreciate counsel's desire that we address them for prospective guidance.
*232 The OPA is distinctively broad in declaring that its immunity "shall be" enforced at a wide span of chronological stages of the criminal process, specifically including arrest, charge, prosecution, and conviction. N.J.S.A. 2C:35-30(a) and -31(a). As a leading commentator has observed, the OPA's protection "is more than a defense; it is broader. It forbids arrest and prosecution so it may be a ground for release and for dismissal of charges." Cannel, N.J. Criminal Code Annotated, cmt. on N.J.S.A. 2C:35-31 (2017). The Office of the Attorney General has expressed apparent agreement with this basic proposition, stating in a directive: "[T]he law clearly precludes not only an arrest, but also an ensuing prosecution or conviction." Attorney General's Directive to Ensure Uniform Statewide Enforcement of the "Overdose Protection Act", § 7, from John J. Hoffman, Attorney General, to All County Prosecutors (June 25, 2013).
The Act thus literally extends immunity to all phases of the criminal process, starting with a person's arrest and culminating with conviction at a trial. That continuous and broad application is consistent with the objectives of the statute to encourage people to seek medical treatment for persons who appear to be experiencing an overdose. Persons who would call for or seek help might hesitate if they knew the immunity would be useless to them until the time of an eventual trial, and would not provide a basis to free them from pretrial release from jail or enable criminal charges to be dismissed at an early stage.
Hence, we hold that the OPA immunity can be raised at any time in the criminal process, including, for example, the grand jury phase, the post-arrest or post-charge phase, a bail or pretrial detention hearing, a pretrial motion to dismiss charges, or as a defense at trial. Because the OPA does not negate an element of a crime but instead is based on separate public policies that confer immunity from what otherwise would comprise an offense under certain CDS statutes, we believe the burden of proving the immunity is properly placed upon the defendant. The defendant bears that burden of establishing the immunity by a preponderance *233 of the evidence. See N.J.S.A. 2C:1-13(d) (mandating that where the application of the criminal code depends on a finding of facts which is not an element of an offense or designated by statute as an affirmative defense, the *1184 burden of proving those facts rests upon the party "whose interest or contention will be furthered if the finding should be made"); see also State v. Ingram, 98 N.J. 489, 493, 488 A.2d 545 (1985).
If a defendant raises the OPA immunity at time of a jury trial and the issue poses a factual dispute as to its applicability, the jury should be provided with instructions explaining the elements of the statute.[7]
A somewhat more difficult procedural uncertainty relates to identifying who is to resolve factual disputes arising under the immunity's applicability: the court, a grand jury, or a trial jury? Such factual disputes may, for example, involve whether the subject exhibited at the time of the call an "acute condition" and manifested a "physical illness" caused by CDS consumption, or whether a layperson would "reasonably believe" the subject "requires" medical assistance; or whether the call for assistance was made in "good faith." We suspect that in some cases these questions are readily answered by the review of documents, such as police reports or grand jury testimony, and will pose no genuine issues of disputed fact. However, in other instances the documentary record may be incomplete or inconclusive.
We do not adopt the view that a grand jury considering evidence of illegal drug offenses must always be told, in every case where a defendant had received medical assistance, about proofs relating to that defendant's possible OPA immunity and given a charge explaining the immunity. If, for example, the immunity clearly does not apply on the facts, then such proof would not be exculpatory and there would be no obligation to *234 present such evidence to the grand jurors or to instruct them about the OPA.
In other circumstances where the OPA's application is less clear cut, we believe the well-established general principles for grand jury practice, as expressed by the Supreme Court in State v. Hogan, 144 N.J. 216, 236-37, 676 A.2d 533 (1996), should be followed. The Court in Hogan acknowledged that grand jurors should be advised of "clearly exculpatory" proof that "directly negates" a prospective defendant's guilt. Id. at 237, 676 A.2d 533. In addition, the circumstances may require the grand jurors to be charged as to specific exculpatory defenses. State v. Hogan, 336 N.J. Super. 319, 341-42, 764 A.2d 1012 (App. Div. 2001). "[I]t is only when the facts known to the prosecutor clearly indicate or clearly establish the appropriateness of an instruction that the duty of the prosecution arises." Id. at 343-44, 764 A.2d 1012 (citations omitted). Even so, the Supreme Court also cautioned in Hogan that an indictment should be dismissed on that basis only in "rare" situations, and that "courts should act with substantial caution before concluding that a prosecutor's decision [to not present certain allegedly-exculpatory proofs] was erroneous." Hogan, 144 N.J. at 236-39, 676 A.2d 533. To borrow a common phrase, the proofs of the immunity's applicability must be so apparent as to be "jumping off the page." See State v. Denofa, 187 N.J. 24, 42, 898 A.2d 523 (2006).
More frequently, we suspect that a defendant, as in this case, will move after he or she has been charged to dismiss the indictment or charges. The defendant may accompany that motion with proofs that go beyond the grand jury record, such as hospital or medical reports, or statements by eyewitnesses who observed his or her *1185 condition at the time medical assistance was sought.
If a bona fide factual dispute of OPA immunity is presented before trial, that issue ordinarily must be decided by the trial court before the time of trial. The need for a timely pretrial ruling on the subject is dictated by the terms of the statute, which protects a qualifying person not only from "conviction," but also *235 from arrest, charge, and prosecution. N.J.S.A. 2C:35-30(a) and -31(a). We reject the State's suggestion that the issue be deferred to the time of trial.
We further conclude that the preferred means for the trial court to adjudicate the factual dispute in the distinctive context of the OPA immunity is to conduct an evidentiary hearing, unless the defendant elects to waive such a hearing and have the factual questions relating to the immunity decided by a trial jury.
In calling for hearings by trial courts to resolve fact issues in appropriate OPA immunity disputes, we recognize that, as a general proposition, our rules of court "do not authorize summary judgment[-type procedures] in criminal cases." State v. Nicholson, 451 N.J. Super. 534, 542, 169 A.3d 990 (App. Div. 2017) ; see also State v. Parker, 198 N.J. Super. 272, 278, 486 A.2d 1275 (App. Div. 1984). However, in certain situations involving whether an immunity from criminal prosecution is supported by the facts, our courts have recognized a narrow exception to that principle.
For example, in State v. Strong, 110 N.J. 583, 542 A.2d 866 (1988), the Supreme Court remanded a criminal case to the trial court for a new evidentiary hearing on a defendant's motion to dismiss an indictment based on the defendant's assertion that the prosecution was barred because of immunity that had been previously granted to him as a witness. Id. at 608, 542 A.2d 866. The trial court was tasked in Strong with determining from the facts whether the immunity extended to the testimony of another person who had testified before the grand jury, or whether the testimony was derived independently from the earlier compelled testimony of the immunized witness. Id. at 601-02, 542 A.2d 866. The Court concluded that because the dispositive factual issue had not been "fully explored and developed" in the trial court, "there must be a remand and reconsideration of [the] issue." Id. at 604, 542 A.2d 866.
Similarly, in State v. Barone, 147 N.J. 599, 689 A.2d 132 (1997), the Court upheld a trial court's decision to conduct an evidentiary *236 hearing concerning a defendant's invocation of an immunity, despite the fact that a federal court had previously addressed immunity issues at a hearing without the State's participation. Id. at 610-16, 689 A.2d 132. Reversing the Appellate Division, the Court in Barone upheld and reinstated the Law Division judge's determination that the State's indictment was based upon independent sources not derived from an immunized proffer session with federal agents. Id. at 614-16, 689 A.2d 132.
The State's reliance on State v. Ochmanski, 216 N.J. Super. 240, 244-45, 523 A.2d 289 (Law Div. 1987) in opposing an evidentiary hearing in the OPA setting is unavailing. Ochmanski did not involve an issue of criminal immunity. Instead, it considered whether a defendant's criminal liability was precluded by the statute of limitations because of a factual dispute concerning the defendant's fugitive status that would extend the limitations period. Id. at 245, 523 A.2d 289. The Law Division judge in Ochmanski noted that such a factual dispute concerning the proper computation of the statute of limitations "is for the jury to decide, not the judge at a pretrial testimonial *1186 [motion] hearing." Ibid. By contrast to a statute of limitations, which supplies a potential defense to prosecution, the OPA provides immunity from prosecution itself, starting with the arrest and charging phase. As such, Ochmanski is distinguishable.
We also do not find dispositive State v. Majewski, 450 N.J. Super. 353, 162 A.3d 1083 (App. Div. 2017), which the State has also cited. The defendant in Majewski moved to dismiss an indictment on the ground that the prosecutor had misrepresented the applicable law to grand jurors and had failed to tell the grand jurors about allegedly exculpatory evidence relating to the element of purposeful intent. Id. at 359, 162 A.3d 1083. We reversed the trial court's denial of the motion to dismiss because we concluded from the record that the State had failed to define a material element of the crime for the grand jurors, without resolving whether "internally inconsistent" accounts of witnesses comprised "clearly exculpatory" proof that should have been presented *237 to the grand jurors. Id. at 368, 162 A.3d 1083. We concluded that the best course under the circumstances was for the existing indictment to be dismissed and the matter presented anew before another grand jury. Ibid. If the State secured a new indictment, defendant could move again for dismissal in the trial court. Ibid.
Although re-presentment to a grand jury was the appropriate approach in Majewski, that remedy does not necessarily pertain to situations of a statutory immunity where, as we discuss infra, factual disputes exist that do not result from grand jury omissions or a violation of Hogan. See also Nicholson, 451 N.J. Super. at 542 n.3, 169 A.3d 990 (noting that, as an exception to the general rule in federal and New Jersey criminal courts, a pretrial motion to dismiss an indictment is a "permissible vehicle" to address the sufficiency of the government's evidence in narrow instances where there is a stipulated record or "immunity issues are implicated"). In short, the immunity context can provide a discrete exception to the general practice that disfavors having criminal trial judges conduct evidentiary hearings about the facts of a case.
As may be appropriate, the hearing may entail testimony from witnesses, as well as documentary proofs. As we have already noted, the defendant will have the burden of proving evidence to support the immunity, which the prosecutor can attempt to dispel.
We have considered the possibility of the factual issues instead being referred back to a grand jury rather than decided by the court. That is an option the parties may mutually elect to pursue. If the grand jury elects to "no-bill" the case with the additional immunity-related evidence, then the matter is over. However, if the grand jurors do elect to re-indict, their decision is not final, and defendant may move once again to dismiss the indictment on appropriate grounds.
In noting these various alternatives, we point out that one procedural advantage of litigating the factual dispute before the *238 court (or a trial jury) at an adversarial proceeding, rather than before a grand jury, is that a hearing in court affords defense counsel the opportunity to call and cross-examine witnesses, to present argument to the tribunal, and to respond to the prosecutor's proofs and arguments. The one-sided nature of a grand jury proceeding, by contrast, might be less effective in developing an appropriate record to resolve the immunity issue.
If the trial court determines the OPA immunity applies, the charges covered by the immunity must be dismissed, *1187 subject to the State's right of appeal, as was exercised in this case. Conversely, if the court finds the facts as presented to it at the motion phase do not support the immunity, the defense nonetheless must be afforded a final opportunity at trial to persuade a jury as the ultimate fact-finder to the contrary, and marshal further proofs and arguments on the subject. Cf. State v. Hampton, 61 N.J. 250, 271-72, 294 A.2d 23 (1972) (analogously permitting a jury to assess the voluntariness and probative value of a confession the trial court ruled earlier at a pretrial hearing was sufficiently voluntary to be admissible). Although we recognize this would provide a defendant with a "second bite at the apple," the OPA's explicit provisions immunizing eligible defendants from prosecution and conviction logically support providing them with a final opportunity to persuade the jurors to consider their immunity claims.
III.
We now apply these general principles to the specific circumstances of this case. The record presented to us unfortunately is quite limited. The factual portions relevant to OPA immunity in our record are set forth in only a few paragraphs of grand jury testimony by a New Jersey Transit police officer, Leonard Romano, Jr. It is undisputed that Officer Romano was dispatched to the Long Branch train station on the evening of November 4, 2016.
Here is how the officer described the circumstances to the grand jurors, in questioning by an assistant prosecutor:
*239 Q Did you have occasion to go to the Long Branch Police-I'm sorry, the Long Branch Train Station?
A Yes.
Q Okay. And that was for a report of an intoxicated subject in the waiting area.
A Yes.
Q Did you go to that location?
A Yes I did.
Q Did you see somebody that you would later identify as [W.S.B.]?
A Yes.
Q All right. And can you please describe for the members of the Grand Jury, his demeanor. How was he acting when you came across him?
A He was in the waiting room, it looked like he fell off the bench and he was on the floor. He looked like he was, at first, drunk, but then once I was able-he wasn't really responsive. Then once he opened his eyes and knew what was going on, I could tell, I could see the pinpoint eyes. Which is common with narcotics use, specifically heroin.
I notified EMS right away because I was going to sit there and talk to him, but he didn't really know what was going on. He didn't even know he was in Long Branch.
Q Okay. But although it was initially intoxicated, somebody thought potentially alcohol. From your training [and] experience it looked more like drugs.
A Yes.
Q Okay. But you called EMS and [W.S.B.] was taken to the local hospital, is that correct?
A Yes.
[ (Emphasis added).]
Although defense counsel[8] at the oral argument before the motion judge, as well *1188 as the judge's written opinion, both briefly allude to a written police report, we have been advised by appellate counsel that the police report was never moved into evidence. Nor had the police report been furnished to us as part of the record on appeal.
Defense counsel at the motion hearing did present and move into evidence a one-page "arrest booking sheet." The booking sheet contained two photos taken of defendant in his hospital bed, *240 noting the time of his arrest was 10:45 p.m., and that he was being charged with possession of CDS (heroin) and being under the influence of heroin. Defendant's trial counsel also provided the motion judge in her moving papers with a one-page excerpt of his medical record, which the State asserts it did not possess until that time. The medical record excerpt states that the hospital's medical staff diagnosed defendant with an "intentional drug overdose."
The only other noteworthy portion of the grand jury transcript that warrants discussion here is the following excerpt, which occurred after certain questions from the grand jurors had prompted the police officer to resume his testimony:
[PROSECUTOR]: Officer, I'm going to ask you to retain your seat. During deliberations there were one or more questions about the case. I just want to ask you some questions.
Q The heroin was allegedly found in a glasses case in a bag, is that correct?
A Yes.
Q The bag belonged to [W.S.B.].
A Yes.
Q How do you know it belonged to [W.S.B.]?
A When he was slumped over on the floor, the bag was still on his back.
Q Okay, so the bag was on his back-
A It was a book bag, it wasn't just a normal shoulder bag, it was a book bag. So it was on his, it was still strapped to him while he was on the floor.
Q Okay. There was another question, yes sir.
JUROR: And at the hospital was there a diagnosis and treatment that was reported for this or do we not know?
[PROSECUTOR]: I'm going to interrupt that question. A person's medical records are private and confidential.
JUROR: Okay.
[ (Emphasis added).]
The grand jury indicted defendant and charged him with third-degree possession of Schedule I CDS under N.J.S.A. 2C:35-10(a)(1). Defendant moved to dismiss the indictment, arguing that the OPA protected him. The State contended that defendant's condition was not within the scope of a "drug overdose" set forth *241 in N.J.S.A. 24:6J-3. The trial court rejected that argument and granted defendant's motion to dismiss the indictment.
In a detailed written opinion dated August 17, 2017, the trial court construed the applicable provisions of the OPA. The court found that under the broad statutory definition of "drug overdose," defendant was entitled to immunity.
We generally agree with the trial court's scholarly analysis of the OPA. However, we are not confident that the sparse record is adequate to resolve the parties' fact-laden dispute concerning the applicability of the OPA immunity in this case.
Among other things, the record is unclear or inconclusive concerning the details *1189 of such aspects as: (1) the supposed hearsay report[9] of an "intoxicated" person on the floor of the train station; (2) whether any bystanders observed defendant's condition; (3) how his condition was described by the officer in the full police report; (4) what additional observations the officer made concerning defendant's actual condition, if any; (5) whether defendant exhibited any signs of acute physical illness; and (6) exactly why the officer called for EMT assistance and particularly whether his call was prompted by routine standard police protocols rather than an individualized assessment that defendant's condition was "acute" and "required" medical assistance. These topics, and any others of relevance, should be explored at a full evidentiary hearing.
We discern no need to compel this case to be presented anew before a grand jury. The factual applicability or inapplicability *242 of OPA immunity to this matter is not obvious from the record, at least the one provided to us. This is not the rare situation in which exculpatory proof "jumps off the page" to an extent requiring the indictment to be set aside because of alleged prosecutorial misconduct before the grand jury. That is far from the case here, especially since the State did not even possess defendant's medical records diagnosing him with an overdose until the one-page excerpt was supplied by trial counsel as part of the dismissal motion papers.
As an aside, we must briefly note that it was inaccurate for the assistant prosecutor to respond extemporaneously to the grand juror's query about defendant's medical records by saying, without qualification, that such records are "private and confidential" and then cutting off the query. Actually, under federal regulations adopted pursuant to the Health Insurance Portability and Accountability Act ("HIPAA"), 42 U.S.C. § 1320d to -9, a hospital "may disclose protected health information for a law enforcement purpose to a law enforcement official if ... [i]n compliance with and as limited by the relevant requirements of ... [a] grand jury subpoena ...." 45 C.F.R. 164.512(f)(1)(ii)(B). A grand jury subpoena alone is sufficient under HIPAA for a covered entity such as a hospital to disclose protected health information for law enforcement purposes. In re Grand Jury Proceedings, 450 F.Supp.2d 115, 116 (D. Me. 2006).
That said, we do not find that the prosecutor had an obligation to subpoena or otherwise obtain defendant's medical records in this case. At most, the records have only limited probative value under N.J.R.E. 401 as corroborative proof, arguably to rebut the State's claim that a lay perception of a drug overdose here would be untenable.
As we have already noted, the focus of the statute is on a layperson's reasonable perception. Indeed, it is conceivable in some instances that OPA immunity could still apply if a layperson observing a subject reasonably believed that person had an acute *243 condition satisfying the definition of N.J.S.A. 24:6J-3, even though *1190 medical professionals later concluded that the person had not been in such a severe state. In any event, we find no prosecutorial misconduct occurred here, despite the inaccurate ad hoc response supplied to the grand jurors about medical confidentiality.
IV.
For these reasons, the trial court's order dismissing the indictment is vacated without prejudice, and the matter is remanded for further proceedings consistent with our opinion. The trial court shall duly consider defendant's custody or bail status in the interim. We do not retain jurisdiction.

The trial court did not find the State violated any duty by failing to instruct the grand jurors about the OPA in this case, and instead rested its immunity finding on its assessment of the facts in the paper record. For the reasons we amplify, infra in Part IV, we regard the factual record here, at least in its present form, as being sufficiently ambiguous and debatable to conclude the State was not obligated to charge the grand jurors with the OPA. We do have some concerns relating to the assistant prosecutor's response to a grand juror's query about defendant's hospital records, a topic we will also address, infra.

For instance, the original version of GSERA would have extended criminal immunity to persons having the intent to share drug paraphernalia, but that facet of the proposed law was removed by the first reprint of GSERA. Compare A. 578 (2012) with A. 578 (2012) (first reprint). Notably, the original GSERA bill did not include the word "charge" within some of the law's immunity provisions, but that term was later inserted in the second reprint. Compare A. 578 (2012) (first reprint) with A. 578 (2012) (second reprint).

Originally, the OPA was named the "Opioid Antidote and Overdose Prevention Act," but once the bill was amended to incorporate provisions from GSERA, the name was changed to the "Overdose Prevention Act."

About forty states have similar immunity provisions, sometimes referred to as "Good Samaritan" laws. See Legal Interventions to Reduce Overdose Mortality: Naloxone Access and Overdose Good Samaritan Laws, The Network for Public Health Law (July 2017), available at https://www.networkforphl.org/_asset/qz5pvn/network-naloxone-10-4.pdf. New Jersey also has a somewhat analogous statute, which grants immunity to underage drinkers who call for medical assistance for themselves or another underage drinker who appears to be in need of medical assistance. N.J.S.A. 40:48-1.2a.

This is the current definition of "medical assistance" in the statute following its slight amendment in 2015. See L. 2015, c. 10 § 1. The original definition in the 2013 version read:
" 'Medical assistance' means professional medical services that are provided to a person experiencing a drug overdose by a health care professional, acting within the scope of his or her lawful practice including professional medical services that are mobilized through telephone contact with the 911 telephone emergency service." See L. 2013, c. 46. The salient difference is the insertion in 2015 of the term "health care practitioner." Indisputably, in the present case, defendant was treated by health care practitioners after his condition was reported by the police officer.

Because no model charges under the OPA presently exist, we respectfully refer our opinion to the Model Criminal Jury Charge Committee for its consideration.

A different assistant public defender and a different assistant prosecutor now represent the parties on appeal. We appreciate their efforts in clarifying for us the actual contents of the trial record.

We note that the standard under N.J.S.A. 24:6J-3 logically calls for an assessment with respect to the perceptions of the person(s) who actually called for medical assistance i.e., here the officer, and not the unidentified hearsay declarant who apparently called the dispatcher seeking police, not medical, assistance. In addition, even though the person who called for medical assistance here happens to be a police officer, his factual observations and actions ultimately must be viewed through the statutory prism of a layperson. In essence, the pivotal question comes down to what a hypothetical layperson, who saw what Officer Romano saw, would have reasonably perceived at the scene.