NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3694-15T4

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

JAMES HARRIS, a/k/a
JAMES M. HARRIS III,

     Defendant-Appellant.

_____

APPROVED FOR PUBLICATION

November 15, 2018

APPELLATE DIVISION

Argued September 13, 2018 – Decided November 15, 2018

Before Judges Koblitz, Ostrer and Currier.

On appeal from Superior Court of New Jersey, Law Division, Camden County, Indictment No. 13-10-2986.

Stephen W. Kirsch, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Stephen W. Kirsch, of counsel and on the brief).

Linda A. Shashoua, Assistant Prosecutor, argued the cause for respondent (Mary Eva Colalillo, Camden County Prosecutor, attorney; Linda A. Shashoua, of counsel and on the brief).

The opinion of the court was delivered by

KOBLITZ, P.J.A.D.

After a December 2011 drug-related shooting of two men, a jury convicted defendant James Harris of two counts of first-degree murder, N.J.S.A. 2C:11-3(a)(1) or (2); second-degree unlawful possession of a handgun, N.J.S.A. 2C:39-5(b); and second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a). The judge sentenced defendant to an aggregate seventy-five-year term of imprisonment under the No Early Release Act, N.J.S.A. 2C:43-7.2. Defendant appeals, arguing that a photograph obtained in response to a communications data warrant (CDW) was beyond the scope of the warrant and should have been suppressed, the guilty verdict was improperly coerced by sending the jury back to deliberate after its third declared deadlock, and a new trial should have been granted based on a newly discovered defense witness. We reverse and remand for a new trial because the incriminating photograph of a gun and ammunition was obtained in violation of the New Jersey Constitution and its admission was not harmless.

Police found the bodies of Daquan Hines and Kevin Gould in the driver's and passenger's seats of a gold 1995 Toyota Camry. They were shot to death by the same gun.

At trial, Donnell Ancrum, the State's principal witness, testified to the following facts. Gould called Ancrum in the morning to say he was going to be

in Ancrum's part of town "to sell some weed." Ancrum told Gould he would "check out" the marijuana.

That evening, Hines was in the driver's seat, Gould in the front passenger seat, and Ancrum in the back seat behind Gould. Ancrum saw a man approaching the car. Ancrum got out of the car to let the man into the back seat of the passenger side where he had been sitting. Ancrum began to walk around to the front of the car when he heard gunshots from inside the car. He immediately ran off to call defendant to pick him up.

Ancrum "thought" that defendant was the gunman, but was not completely certain. Ancrum did not clarify why he would call defendant for a ride if he knew defendant had just entered the car and shot two people. The jury heard Ancrum's video-recorded statement, his third statement to police, given nine months after the murder. He told Camden County Prosecutor's Detective Charles Farrell, for the first time, that it was defendant, who came into the car and shot Hines and Gould. Defendant stayed with Ancrum for three nights after the murders.

Cell phone records revealed sixteen calls between Ancrum and defendant that day, including one shortly before the killings, and five calls after the killings. Cell site history tracked defendant's phone before and after the killings,

3

showing that between 6:13 p.m. and 8:42 p.m. that night, defendant was at home in Sicklerville. At 9:23 p.m., both defendant's and Ancrum's phones were in the crime scene area. By 9:26 p.m., both phones were "just outside" of the crime scene area, and then defendant's phone was back near his home around 10:30 p.m.

A State's witness testified that he was incarcerated in the cell next to defendant between December 2011 and June 2012. This witness, who cooperated as part of his federal plea agreement, testified that defendant confessed to the murders.

The State introduced into evidence an October 29, 2011 photograph from defendant's cell phone depicting two handguns and three boxes of ammunition. One of the guns was a Hi Point .380 caliber semi-automatic pistol, and some of the ammunition was .380-caliber TulAmmo ammunition, the same as that used in the murders.

On appeal, defendant argues:

> POINT I: THE MOTION TO SUPPRESS THE PHOTO OF GUNS AND AMMUNITION SHOULD HAVE BEEN GRANTED BECAUSE THE JUDGE ERRED WHEN FINDING THE PHOTO TO HAVE BEEN THE FRUIT OF A LAWFUL "PLAIN VIEW" SEARCH AND SEIZURE. JUST AS AN OFFICER MAY NOT PICK UP AND MOVE AN ITEM TO BRING IT INTO A BETTER "VIEW," THIS

4

OFFICER DID NOT HAVE PROBABLE CAUSE TO OPEN THE COMPUTER FILE THAT CONTAINED THE PHOTO IN ORDER TO VIEW THAT PHOTO; ADDITIONALLY, THE DISCOVERY OF THE PHOTO WAS NOT "INADVERTENT," AS THE CASE LAW REQUIRED AT THE TIME.

POINT II: THE JUDGE'S HANDLING OF THREE SEPARATE JURY DEADLOCKS, AFTER FOUR DAYS OF DELIBERATIONS, IMPROPERLY CONVEYED TO JURORS THAT THEY WERE BEING COMPELLED TO RETURN A UNANIMOUS VERDICT, THEREBY INAPPROPRIATELY COERCING THAT VERDICT.

POINT III: THE MOTION FOR A NEW TRIAL BASED ON NEWLY DISCOVERED EVIDENCE SHOULD HAVE BEEN GRANTED. THE PROFFERED NEW WITNESS WOULD HAVE COMPLETELY UNDERMINED THE CREDIBILITY OF THE STATE'S PRINCIPAL WITNESS, THUS RAISING A PROBABILITY THAT THE EVIDENCE WOULD HAVE AFFECTED THE VERDICT UNDER THE STANDARD OF STATE V. CARTER.

## I. Motion to Suppress

At the hearing on defendant's motion to suppress the photograph of the handgun and ammunition, the judge heard testimony from two witnesses: Detective Farrell, who reviewed the computer disc (CD) containing the subpoenaed information from Sprint and found the photograph; and Ryan Harger, a supervisor and record custodian for Sprint in the "subpoena compliance group." Farrell discovered the October 29, 2011 photograph when

Sprint responded to the CDW covering defendant's phone use from December 1 to December 16, 2011. Sprint provided a call log for that December time range only, but, without restriction, supplied all Picture Mail records associated with defendant's Sprint account.[1] Although the caption of the CDW included the word "photograph," the warrant by its terms did not seek photographs at all, but rather

> all calls, local and long distance, made from and to [defendant's phone number] including cellular telephone call detail records, CELL SITE locations, records and content of incoming and outgoing text messages, and subscriber information for [defendant's phone number] . . . for the period of December 1, 201[1] through and including December 16, 2011, and the obtaining of subscriber information . . . .

The October photograph of the guns and ammunition was sent well outside the two-week December time frame of the CDW. Harger testified that it was Sprint's protocol at that time to provide all electronic folders containing photographs from Picture Mail without sorting them by date, regardless of the dates requested in the CDW. The folders were each designated by a lengthy

---

[1] In 2011, Sprint provided a service called Picture Mail. Photographs were stored in a subscriber's Picture Mail account when the subscriber manually uploaded a photograph to his or her account, or when the subscriber sent or received a photograph.

A-3694-15T4

number. The first digits represented the date the photograph was sent or received, with the year first. The designation on the folder containing the photograph in question began, "20111029." The folders were listed chronologically.[2] Each folder contained two types of electronic files; in one file was a JPEG, the actual picture, and in the other file, a text document with information including the date and time the photograph was sent or received.

Farrell testified to the following. When he received the CD from Sprint in response to the CDW, he checked the call log right away to make sure that the dates provided corresponded to the date restrictions of the warrant, but assumed without checking that the photographs were within the correct time range. He did not recognize that the first digits on the Picture Mail folders represented the date the photograph was sent or received. He did not open the text documents, which would have revealed the date the photograph was sent or received. He looked only at the photographs, reviewing all the JPEGs to see if they were relevant to the investigation.

In preparing for the suppression motion, Farrell opened the text document file associated with the photograph for the first time. He then opened the text

---

[2] The fact that the folders were identified by date and listed chronologically was not brought out at the suppression hearing, but acknowledged by both parties in supplemental briefing.

document within and learned that the photograph in question was sent October 29, 2011. Prior to opening this text file, Farrell did not know the file dated the photograph.

Finding both of the State's witnesses credible, the judge denied defendant's motion to suppress the photograph, ruling that although the CDW did not, by its plain language, cover any photographs, and this photograph was sent beyond the time range provided in the warrant, the photograph was admissible under the plain view exception to the warrant requirement. The judge found the search met all three prongs of the "plain view" exception: Farrell was lawfully in the viewing area because he had a warrant for the phone's data; he inadvertently found the photograph because he reasonably assumed the photographs provided were within the requested date range; and the photograph was immediately recognizable as evidence of the crime. The judge concluded that no police misconduct occurred and thus applying the exclusionary rule would serve no deterrent effect.

"An appellate court reviewing a motion to suppress evidence in a criminal case must uphold the factual findings underlying the judge's decision, provided that those findings are 'supported by sufficient credible evidence in the record.'" State v. Sencion, 454 N.J. Super. 25, 31 (App. Div. 2018) (quoting State v.

Boone, 232 N.J. 417, 425-26 (2017)).  We do so "because those findings 'are substantially influenced by [an] opportunity to hear and see the witnesses and to have the "feel" of the case, which a reviewing court cannot enjoy.'"  Ibid. (alteration in original) (quoting State v. Gamble, 218 N.J. 412, 424-25 (2014)).  "A judge's findings should not be disturbed simply because an appellate court 'might have reached a different conclusion . . . .'"  State v. Mann, 203 N.J. 328, 336 (2010) (quoting State v. Johnson, 42 N.J. 146, 162 (1964)).  We owe no deference "to conclusions of law made by judges in suppression decisions, which we instead review de novo."  Sencion, 454 N.J. Super. at 31-32.

"The Fourth Amendment to the United States Constitution and Article I, [P]aragraph 7 of the New Jersey Constitution require that police officers obtain a warrant before conducting a search, unless that search falls into a recognized exception to the warrant requirement."  Id. at 32.  "A search without a warrant is presumptively invalid" unless it falls within an exception to the warrant requirement, Mann 203 N.J. at 340, and the State "bears the burden of proving by a preponderance of the evidence that a warrantless search or seizure 'falls within one of the few well-delineated exceptions to the warrant requirement.'"  State v. Elders, 192 N.J. 224, 246 (2007) (quoting State v. Pineiro, 181 N.J. 13,

19-20 (2004)). "[Those exceptions] include, among others, plain view . . . ." State v. Pena-Flores, 198 N.J. 6, 18 (2009).

In U.S. v. Leon, 468 U.S. 897, 905, 920 (1984), the "good faith" exception to the exclusionary rule was created in federal law. Although the language of Article I, Paragraph 7 of the State Constitution is identical to the 4th Amendment, our Supreme Court has rejected the "good faith" exception. State v. Novembrino, 105 N.J. 95, 157-58 (1987). Our Court ruled that the function of the exclusionary rule under the State Constitution serves as "the indispensable mechanism for vindicating the constitutional right to be free from unreasonable searches." Id. at 157.

In Boone, the Court suppressed evidence found in Apartment 4A of a thirty-unit building as a result of a warrant issued on the basis of an application that contained no information as to how the officers knew that Apartment 4A was defendant's residence. 232 N.J. at 421. The Court stated that although this omission was probably an innocent oversight by the police, New Jersey does not recognize an officer's good faith alone as an exception to the warrant requirement. Id. at 430-31.

A-3694-15T4

Under the plain view doctrine at the time this case was decided,[3] three elements needed to be satisfied: 1) a police officer "must be lawfully in the viewing area"; 2) the officer "has to discover the evidence 'inadvertently,' meaning that he [or she] did not know in advance where evidence was located nor intend beforehand to seize it"; and 3) it must be "'immediately apparent' to the police that the items in plain view were evidence of a crime, contraband, or otherwise subject to seizure." Mann, 203 N.J. at 341 (quoting State v. Bruzzese, 94 N.J. 210, 236 (1983)).

The "inadvertence" prong of the plain view test "is satisfied if the police did not 'know in advance the location of the evidence and intend to seize it'. . . ." State v. Johnson, 171 N.J. 192, 211 (2002) (quoting Coolidge v. New Hampshire, 403 U.S. 443, 470 (1971)). Under the "immediately apparent" requirement, "in order to seize evidence in plain view a police officer must have 'probable cause to associate the [item] with criminal activity.'" Mann, 203 N.J. at 341 (alteration in original) (quoting Bruzzese, 94 N.J. at 237).

---

[3] Our Supreme Court eliminated the second prong, "inadvertence," from the plain view test, making clear that the ruling was prospective only. State v. Gonzales, 227 NJ. 77, 82 (2016) (holding that the inadvertence requirement for a plain-view seizure "is at odds with the objective-reasonableness standard that governs our state-law constitutional jurisprudence").

The State relies on a federal case for the proposition that plain view may apply to an electronic search. In United States v. Stabile, the Third Circuit addressed the issues of whether a detective properly viewed files found on a hard drive folder, and "whether evidence of other crimes in a computer can be examined under the plain view doctrine." 633 F.3d 219, 237, 240 (3d Cir. 2011). In Stabile, the police were given a warrant to search a computer for evidence of financial criminal behavior. Id. at 226. The search revealed files labeled as storing child pornography. Id. at 227-28. The court held that evidence of sexual crimes was in plain view, as the police officer was properly inspecting the contents of the computer. Id. at 241-42. The Third Circuit noted that "the plain view doctrine applies to seizures of evidence during searches of computer files, but the exact boundaries of the doctrine will vary from case to case in a common-sense, fact-intensive manner." Id. at 240-41. Here, the police were not searching the hard drive of a computer, but rather were inspecting a CD provided in response to a CDW that covered December 1 through 16, and did not cover photographs. For the police to open and inspect nonresponsive photographs sent or received outside of the operative time frame was not a plain view search, nor permissible.

Farrell's ignorance of the technology surrounding electronic files does not excuse opening material not responsive to the CDW. The State could reasonably have had a technology-literate investigator inspect the CD. An officer is not in a lawful viewing place when he opens JPEG files clearly containing photographs provided in response to a CDW that does not authorize the review of photographs. The detective's actions of clicking on the files to open them up are analogous to an officer opening a door or cabinet to view what is inside, essentially to get a better view of the item. This is contrary to Arizona v. Hicks, 480 U.S. 321, 324-25 (1987) (holding that the officer's actions, in moving stereo equipment in order to locate serial numbers to determine if equipment was stolen, constituted a "search," even though the officer was lawfully present within the apartment where the equipment was located in plain view). Clicking to open a JPEG was similar to moving stereo equipment to locate a serial number. Without probable cause to search that item, plain view does not justify the search. The "inadvertence" prong was also not satisfied because the officer knew that the JPEG files were photographs, which were not included in the warrant, making his plain view neither inadvertent nor in compliance with Hicks.

The folder date designations and the text files containing information regarding dates outside of the warrant further notified the police that the folders were not within the time frame of the warrant. As in Boone, the officer's "innocent oversight" does not excuse the violation of the need for a warrant or probable cause. 232 N.J. at 431.

The State's argument that the judge was incorrect in his determination that the CDW did not include photographs in its scope is without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).

The State's argument that the admission of the photograph was harmless error is also not persuasive. For error to be harmless, the State must demonstrate beyond a reasonable doubt that the error did not contribute to the defendant's conviction. State v. Camacho, 218 N.J. 533, 548, 554-55 (2014); see State v. J.R., 227 N.J. 393, 417 (2017) (noting that "[a]n evidentiary error will not be found 'harmless' if there is a reasonable doubt as to whether the error contributed to the verdict").

The prosecutor placed great weight on the photograph, stressing the "importan[ce]" of the photograph at least fourteen different times in summation. He spoke of the photograph as "[a] huge piece of evidence I can't . . . overestimate; I can't say enough how important this evidence is . . . . It's a huge

piece of evidence.  It doesn't lie.  It's objective.  It's so strong it proves he's guilty."  The prosecutor continued:

> And there we have the photo as I suggest to you with the next big piece of evidence in this case, the photo from the defendant's cell phone.  It shows .380 caliber Hi-Point handgun next to a box of .380 TulAmmo ammo . . . .  This is more than just a photograph. . . . These aren't just photos; these are photos of real guns and real ammunition that I suggest to you were used to commit these murders.
>
> . . . .
>
> What does that mean?  Here's what it means:  The defendant took this photograph with his own cell phone and texted it to somebody else.  This I suggest to you, ladies and gentlemen, what you're looking at right here, is the murder weapon.  This is it.  This is the gun that was used to kill Daquan Hines and Kevin Gould.  It's right there, because the defendant had it six weeks prior and he kept it all along that time and six weeks later he used it to kill these two kids.
>
> And this is also the murder ammunition.  The murder ammunition is the TulAmmo ammo.  That was also, I suggest to you, is the ammunition used to commit these murders.  It matches exactly what was found at the crime scene, .380-caliber TulAmmo ammo, nine lands and grooves with a lefthand twist, which is the Hi-Point firearm.

The State thus argued to the jury that this photograph depicted the actual weapon and ammunition used in the murders.

15

Additionally, the fact that the jury was deadlocked three times indicates at least one member of the jury did not find the State produced overwhelming evidence of defendant's guilt. We cannot find beyond a reasonable doubt that the photograph did not affect the verdict. We thus reverse the denial of defendant's suppression motion and remand for a new trial without the use of the photograph. We will briefly discuss defendant's remaining issues.

## II. Deadlocked jury

The decision by a judge to send a jury back for further deliberations after it has announced a deadlock is discretionary and will be reversed on appeal only if the judge has abused his discretion. See State v. Figueroa, 190 N.J. 219, 235 (2007) (explaining that our Supreme Court "left it to the sound discretion of the judge" to decide whether repeating the Czachor jury instruction "is appropriate when a jury reports" a deadlock (citing State v. Czachor, 82 N.J. 392, 407 (1980))). It would be improper, however, to give or repeat the Czachor instruction "if the jury has reported a definite deadlock after a reasonable period of deliberations." Ibid.

The jury began deliberating on December 10, 2015. Deliberations continued on December 15, 16, and 17, 2015. During those days, the jury

A-3694-15T4

requested and received a number of playbacks of testimony, videos and statements. The jurors reported their first deadlock on December 17, 2015.

After receiving the first note that the jury was deadlocked, the trial judge read the standard Czachor instruction. A few hours later, the jurors submitted a note saying: "We feel that it would not be beneficial to view the video again. We feel that it will not change anyone's decision and we are deadlocked. We cannot reach a unanimous decision." Defense counsel consented to another Czachor instruction. A bit over an hour and a half after that second Czachor charge, the jurors sent their third deadlock note of the day, stating: "We are still deadlocked and cannot come to a unanimous decision." Defense counsel asked for a mistrial, but the judge denied the request and instead told the jury to return the following day for further deliberation because of the "relative complexity" of the case. The judge noted that although the jury had deliberated over five separate days, deliberations had been broken up for the jury to view videos and listen to playbacks several times, and that the time actually spent deliberating was in the range of ten to twelve hours while the trial had gone on for about six weeks. No new instruction was given and the jury was not asked if further deliberation would be futile. The next morning, the jury commenced

17

deliberations at 9:15 a.m. and returned a verdict of guilty on all charges by 9:34 a.m.

Defendant argues the trial judge erred by not asking about the futility of further deliberations and that the judge's handling of the jury deadlocks inappropriately coerced a verdict. Defendant contends that the jury's third deadlock note should have indicated a definite deadlock, triggering either a mistrial, or at least a reading of the jury instruction asking the jury if further deliberation would be futile. Defendant argues the failure to give that jury charge was itself an "unduly coercive act toward the obtaining of a verdict."

"Where the court determines that, in a criminal action, the jury has not reached a unanimous verdict, 'the jury may be directed to retire for further deliberations or discharged.'" State v. Johnson, 436 N.J. Super. 406, 422 (App. Div. 2014) (quoting R. 1:8-10). A judge "has discretion to require further deliberations after a jury has announced its inability to agree." Ibid. "[B]ut exercise of that discretion is not appropriate 'if the jury has reported a definite deadlock after a reasonable period of deliberations.'" Ibid. (quoting State v. Adim, 410 N.J. Super. 410, 423-24 (App. Div. 2009)). In determining what constitutes a reasonable length of time, a judge should weigh all the relevant circumstances, including "such factors as the length and complexity of [the] trial

and the quality and duration of the jury's deliberations." Figueroa, 190 N.J. at 235 (alteration in original) (quoting Czachor, 82 N.J. at 407).

A trial judge "may send a jury back for further deliberations when [he or she] is not satisfied that all possibilities of reaching a verdict have been exhausted, but [he or she] may not coerce or unduly influence the jury in reaching a verdict." State v. Carswell, 303 N.J. Super. 462, 478 (App. Div. 1997) (alterations in original) (quoting State v. Childs, 204 N.J. Super. 639, 647-48 (App. Div. 1985)). While our Supreme Court has held that "the appropriate course when a juror indicates that the jury is deadlocked is to inquire of the jury whether further deliberation will likely result in a verdict," Figueroa, 190 N.J. at 240 (quoting State v. Valenzuela, 136 N.J. 458, 469 (1994)), a judge need not always do so. Figueroa, 190 N.J. at 240.

The Czachor instructions, as set forth in the model jury charges, state:

> It is your duty, as jurors, to consult with one another and to deliberate with a view to reaching an agreement, if you can do so without violence to individual judgment. Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors. In the course of your deliberations, do not hesitate to re-examine your own views and change your opinion if convinced it is erroneous but do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors, or for the

19

mere purpose of returning a verdict. You are not partisans. You are judges - - judges of the facts.

[Model Jury Charges (Criminal), "Judge's Instructions on Further Jury Deliberations" (approved Jan. 2013).]

The supplemental charge to a deadlocked jury posits a question:

You have indicated that your deliberations have reached an impasse. Do you feel that further deliberations will be beneficial or do you feel that you have reached a point at which further deliberations would be futile? Please return to the jury room to confer, and advise me of your decision in another note.

[Model Jury Charges (Criminal), "Judge's Inquiry When Jury Reports Inability to Reach Verdict" (approved June 2013).]

Defendant argues this second charge with an imbedded question should have been read to the jury after its third deadlock, if not after the second deadlock.

The jury was originally charged on December 10, 2015. The judge estimated it deliberated for approximately ten hours total – a half hour on December 10, three hours on December 11, one hour on December 15, two-and-a-half hours on December 16, three hours on December 17, and almost fifteen minutes on December 18, 2015. During those days, the jury asked the judge several questions and spent time listening to playbacks of testimony in addition to deliberating.

The judge reasoned that given the length of the trial, which went on for approximately six weeks, and given the complexity of the trial, which included close to two hundred exhibits, seven experts, numerous witnesses, and playback of prior witness statements, approximately ten hours of jury deliberations was not yet a reasonable amount of time.

Although a close question, the judge did not abuse his discretion by forcing a verdict. We review the entire process to emphasize that the jury did not easily reach a verdict on the evidence presented, which included the improperly admitted photograph.

## III. Newly discovered witness

Defendant also argues that the judge wrongly denied his motion for a new trial based on a newly discovered witness who saw Ancrum run from the scene carrying a bag of drugs. The judge explained that the witness's statements would likely support Ancrum's involvement in the crime, but not negate defendant's guilt. We need not determine the strength of this new evidence, given our decision to remand for a new trial.

Reversed and remanded for a new trial. We do not retain jurisdiction.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-3694-15T4