**RECORD IMPOUNDED**

NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3637-23

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

C.C.W.,

     Defendant-Appellant.

_____

**APPROVED FOR PUBLICATION**

**April 29, 2025**

**APPELLATE DIVISION**

Argued March 18, 2025 – Decided April 29, 2025

Before Judges Sumners, Susswein and Bergman.

On appeal from an interlocutory order of the Superior Court of New Jersey, Law Division, Cape May County, Indictment No. 24-01-0008.

Keerah D. McCratic, law student, appearing pursuant to Rule 1:21-3(b), argued the cause for appellant (Rutgers Law School, attorneys; Patrick Severe and Keerah D. McCratic, on the briefs).

James E. Moore, Assistant Prosecutor, argued the cause for respondent (Jeffrey H. Sutherland, Cape May County Prosecutor, attorney; James E. Moore, of counsel and on the brief).

The opinion of the court was delivered by

SUSSWEIN, J.A.D.

This appeal presents a novel statutory construction question under the Overdose Prevention Act (OPA or Act), N.J.S.A. 2C:35-30 to -31 and N.J.S.A. 24:6J, which was enacted to save lives by "encouraging people who witness or experience a suspected drug overdose to seek medical assistance. . . ." N.J.S.A. 24:6J-2. The Legislature recognized that a person might be discouraged from reporting a suspected drug overdose if they believed that calling for medical assistance would lead to arrest and prosecution for unlawfully using or possessing a controlled dangerous substance (CDS). To ameliorate that concern, the OPA guaranties immunity for certain offenders[1] whose crimes were discovered because police responded to an emergency call for medical assistance. In furtherance of its ultimate objective to save lives, the Act provides unequivocally that persons who can establish their eligibility for immunity "shall not be: arrested, charged, prosecuted, or convicted of" a covered offense. N.J.S.A. 2C:35-30(a); N.J.S.A. 2C:35-31(a).

---

[1] As we emphasize later in our opinion, the OPA affords immunity only for use/simple possession CDS offenses. See N.J.S.A. 2C:35-30(c) and N.J.S.A. 2C:35-31(c). It does not provide immunity for a CDS offense involving distribution or possession with intent to distribute. Nor does it afford immunity for any non-CDS offense.

Defendant C.C.W.[2] is charged with unlawful possession of methamphetamine. By leave granted, she appeals the June 12, 2024 Law Division order denying her motion to dismiss the prosecution pursuant to the OPA. Defendant's friend called 911 to report that she told him via telephone that she "wanted to commit suicide." He also reported that defendant "uses crystal meth." Police officers responding to the call transported defendant to a hospital. Upon her arrival, hospital staff inventoried defendant's belongings and found a small amount of methamphetamine in her wallet. The CDS was given to police, leading to defendant's immediate arrest and ensuing prosecution.

This appeal requires us to probe the boundaries of the OPA's definition of the term "drug overdose," focusing on whether the threat of suicide that prompted the 911 call was the result of defendant's CDS use. Because the OPA is a quintessentially remedial statute, we construe its immunity provision liberally. See Battaglia v. United Parcel Serv., Inc., 214 N.J. 518, 555 (2013) (quoting Abbamont v. Piscataway Twp. Bd. of Educ., 138 N.J. 405, 431 (1994)) (explaining that a remedial statute which "promotes a strong public

---

[2] To avoid discouraging other persons who may be covered by the statutory immunity from seeking medical assistance, we use initials to identify defendant. See State v. W.S.B., 453 N.J. Super. 206, 206 n.1 (App. Div. 2018).

policy of the State . . . should be construed liberally to effectuate its important social goal").  The remedial nature of the Act, however, does not mean that we may stray from its plain text.

Notably, the OPA includes a precise, multi-part definition of "drug overdose."  N.J.S.A. 24:6J-3.  One element of the statutory definition requires proof that the overdose subject is experiencing an "acute condition."  Ibid. The State acknowledges that defendant's suicidal ideation constitutes an acute condition.  However, to qualify for the OPA immunity, a defendant must also establish that the acute condition "result[ed] from the consumption or use of a [CDS]."  Ibid.  The Act, in other words, requires proof of a causal nexus between CDS use and the acute condition that prompts the 911 call for medical assistance.  This case turns on whether defendant can establish that nexus.

It bears emphasis that the OPA's definition of "drug overdose" is broader than the common meaning of that term.  Ordinarily, an overdose is a severe reaction to an excessive dose of a drug, such as when a person is rendered unconscious and needs an opioid antidote for resuscitation.  The plain text of the OPA, however, does not require that the subject is presently intoxicated or "under the influence" of a CDS.  Nor does the statutory definition require proof that the drug consumption occurred just before the acute condition arose.

We decline to add preconditions to the Legislature's carefully worded definitions of the terms "drug overdose" and "medical assistance." See N.J.S.A. 24:6J-3. Accordingly, we hold the OPA's plain language does not foreclose the possibility that a defendant might qualify for immunity based on their chronic use of a CDS, i.e., an addiction, provided the acute condition requiring medical assistance is the result of such prior CDS use.

Defendant's entitlement to immunity turns on whether she can carry her burden of proving a causal relationship between her acute condition and prior CDS use. Our review of the record shows that neither the trial court nor the parties focused on the causation element of the statutory definition of drug overdose. It appears, moreover, the trial court incorrectly assumed the Act requires proof that defendant was under the influence of a CDS at the time of the 911 call. Further, it appears the trial court incorrectly assumed that a 911 call resulting in a psychiatric evaluation is not a request for "medical assistance" within the meaning of the Act and that a person suffering from a psychiatric disorder is not eligible for immunity. We therefore deem it necessary to remand for a new hearing to address whether the suicide concerns that prompted the 911 call are attributable to defendant's methamphetamine use.

I.

We discern the following facts and procedural history from the record. On October 28, 2023 at 2:23 a.m., defendant's friend, R.S., placed a 911 call to the Middle Township Police Department (MTPD) requesting a well-being check for defendant. The MTPD incident report's description of the call reads:

> [R.S.] CALLED 911 REQUESTING A CHECK [ON] THE WELL[]BEING O[F] HIS FRIEND [DEFENDANT] WHO REACHED OUT TO HIM VIA TELEPHONE APPROXIMATELY [ONE] HOUR AGO AND STATED THAT SHE WANTED TO COMMIT SUICIDE. [R.S.] STATED THAT [DEFENDANT] USES CRYSTAL METH AND THAT SHE [MAY] HAVE A KNIFE WHICH SHE SAID SHE WANTED TO SLIT HER WRISTS. [R.S.] IS HOMELESS AND ADVISED THAT HE IS SLEEPING UNDER THE NORTH WILDWOOD BRIDGE CLOSER TO NORTH WILDWOOD. I ADVISED [R.S.] TO CALL US BACK IN [TWENTY] MIN[UTE]S IN CASE AN OFFICER NEEDS TO SPEAK WITH HIM AND SEE THE MESSAGES [DEFENDANT] SENT TO HIM.

Responding to the 911 call, MTPD Officer Paul Damiano arrived at defendant's motel room at 2:55 a.m. Defendant stated that she and R.S. had been arguing via text message. She showed Damiano the text messages that she sent to R.S. in which she described "multiple different ways of killing herself." When asked whether she was suicidal, defendant told Damiano that she "has an extensive history of suicidal thoughts and has been admitted to mental health facilities for those instances but did not feel suicidal at the time

of this incident and . . . texted [R.S.] those methods of suicide out of frustration." Damiano noted that during the conversation defendant "exhibited oddly excited behavior, [] was unable to focus on one topic, and had noticeable tremors in her hands and arms."

Because the Alternative Responses to Reduce Instances of Violence and Escalation Together (ARRIVE) Program[3] was unavailable, Damiano requested an Acenda mobile screener[4] to evaluate defendant at the scene. The mobile screener determined that defendant "must go to Cape Regional Medical Center (CRMC) for a Mental Health Evaluation in their Behavioral Health Unit." After patting defendant down for weapons and securing her belongings in the trunk of his patrol vehicle, Damiano transported defendant to the CRMC.

CRMC placed defendant in the Emergency Department (ED) where hospital staff inventoried her belongings. Hospital staff notified Damiano that they found "a small plastic container, containing multiple white crystal-like

---

[3] The ARRIVE Program is a New Jersey Attorney General initiative where mental health screeners arrive on scene with officers. Off. of Att'y Gen., ARRIVE Together Program, https://www.njoag.gov/programs/arrive-together/ (visited Apr. 22, 2025).

[4] Acenda is a private company that provides a "24-hour, seven-day-a-week crisis intervention service" for individuals in Cape May who are "suicidal, homicidal, or acutely psychotic." Psychiatric Emergency Screening Services, Acenda Integrated Health, https://acendahealth.org/programs/psychiatric-emergency-screening-services/ (visited Apr. 22, 2025).

A-3637-23

rocks, suspected of being methamphetamine" in defendant's wallet along with her bank cards and other forms of identification. When Damiano asked defendant what was in the container, she replied that she was unaware what was inside of it. She speculated that R.S. must have placed it in her wallet without her knowledge. Damiano informed defendant she was under arrest and handcuffed her to the hospital bed.

A subsequent search incident to arrest yielded no additional evidence. The ED physician ordered a urine "drugs of abuse" test for defendant, but for reasons not disclosed in the record, the test was later cancelled by the laboratory. Defendant was discharged from the CRMC about three hours and thirty minutes after arriving.

On January 2, 2024, defendant was charged by indictment with one count of third-degree possession of a CDS, methamphetamine, N.J.S.A. 2C:35-10(a)(1). Defendant then filed a motion to dismiss the indictment pursuant to the OPA's immunity provisions.

On June 12, the trial court held a hearing on defendant's dismissal motion. Neither party presented witnesses. After reviewing Damiano's Investigation Report and defendant's CRMC medical records, the court rendered an oral decision, making the following findings:

> Here, the acute condition was the threat of suicide, . . . it was not drug related. . . . The officer

did not call [Emergency Medical Services (EMS)] to the scene but, rather, an emergency psychiatric screener was called first. It was as a result of that evaluation that led [defendant] to be taken to the emergency room.

. . . .

The [c]ourt[] reviewed the medical records. . . . Her diagnosis surrounds perhaps this mania that nowhere in any of the hospital records does it suggest that mania is attributable to anything other than a psychiatric disorder.

The fact that a stat or emergency lab was initially ordered with regard to substance abuse and later canceled I would suggest weighs against [defendant]. Had the emergency room physician who ordered that lab report believed that she was under the influence of something so significant that it led to the mania rather than a psychiatric problem, my sense is they would never have canceled that lab. Because had she been under the influences, perhaps they would have had to have somehow treated that and it doesn't appear anywhere in the medical records that she was ever treated for any kind of an overdose.

Again, . . . nowhere in the records does it indicate that she was suffering a drug overdose. Nowhere in the records does it suggest that she was even under the influence of any intoxicant. . . .

. . . .

. . . The call was initially for psychiatric assistance, suicidality. No lay person at the scene, not the officer, not the psychiatric screener, treated this defendant as if she was having a drug overdose requiring immediate medical assistance.

9

> Clearly, under the lay person standard, there was no reasonable belief that she required medical assistance for a drug overdose. What she required was assistance for suicidal threats.

On July 22, 2024, we granted defendant's motion for leave to appeal the trial court's interlocutory order denying the motion to dismiss the indictment.[5] Defendant raises the following contention for our consideration:[6]

> THE PREPONDERANCE OF THE EVIDENCE ESTABLISHES THAT DEFENDANT'S MOTION TO DISMISS SHOULD NOT HAVE BEEN DENIED BECAUSE THE [OPA] IMMUNIZES [] DEFENDANT FROM THE POSSESSORY DRUG OFFENSE.

## II.

We begin our analysis by acknowledging certain foundational principles governing this appeal. As a general proposition, the scope of our review of a motion to dismiss an indictment is narrow, applying an abuse of discretion standard. State v. Aloi, 458 N.J. Super. 234, 238 (App. Div. 2019) (quoting State v. Ferguson, 455 N.J. Super. 56, 63 (App. Div. 2018)). See also State v.

---

[5] Defendant's notice of motion for leave to appeal focused solely on the trial court order "denying overdose prevention act defense" and did not address the trial court's order denying her motion to suppress the methamphetamine found by hospital staff and turned over to police. Nor was the search-and-seizure issue addressed in defendant's initial brief in support of her motion for leave to appeal.

[6] We omit defendant's search and seizure argument as it is not properly before this court. See note 5.

A-3637-23

Tringali, 451 N.J. Super. 18, 27 (App. Div. 2017) (quoting State v. N.J. Trade Waste Ass'n, 96 N.J. 8, 18-19 (1984)) ("A trial court should only dismiss an indictment on the 'clearest and plainest' grounds and only when it is clearly defective."). Here, however, we are dealing with an immunity statute that, when satisfied, requires the dismissal of an indictment. Defendant seeks to dismiss the prosecution, not because the indictment itself is defective, but rather for public policy reasons set forth in the OPA that override the need to prosecute minor drug offenses.

The law is clear that "[w]hen a decision to dismiss [an indictment] hinges on a purely legal question, []our review is de novo and we need not defer to the motion court's interpretations." State v. Campione, 462 N.J. Super. 466, 492 (App. Div. 2020) (quoting State v. Twiggs, 233 N.J. 513, 532 (2018)). This appeal turns on an interpretation of the OPA. We owe the trial court no special deference on questions of statutory interpretation. State v. Fuqua, 234 N.J. 583, 591 (2018). Furthermore, we are not bound by a trial court's interpretations of the legal consequences that flow from established facts. See Manalapan Realty, L.P. v. Twp. Comm. of Twp. of Manalapan, 140 N.J. 366, 378 (1995); State v. Harris, 457 N.J. Super. 34, 44 (App. Div. 2018).

It is well settled that "[t]he overriding goal of all statutory interpretation 'is to determine as best we can the intent of the Legislature, and to give effect

11

to that intent.'" State v. S.B., 230 N.J. 62, 67-68 (2017) (quoting State v. Robinson, 217 N.J. 594, 604 (2014)). Consequently, "[t]o determine the Legislature's intent, we look to the statute's language and give those terms their plain and ordinary meaning because 'the best indicator of that intent is the plain language chosen by the Legislature.'" State v. J.V., 242 N.J. 432, 442-43 (2020) (first citing DiProspero v. Penn, 183 N.J. 477, 492 (2005); then quoting Johnson v. Roselle EZ Quick, LLC, 226 N.J. 370, 386 (2016)). Accordingly, "[i]f, based on a plain and ordinary reading of the statute, the statutory terms are clear and unambiguous, then the interpretative process ends, and we 'apply the law as written.'" Id. at 443 (quoting Murray v. Plainfield Rescue Squad, 210 N.J. 581, 592 (2012)).

In addition, it is a general principle of statutory construction that reviewing courts must give meaning to every word and phrase in a statute. See Meehan v. Antonellis, 226 N.J. 216, 237-38 (2016). As our Supreme Court explained in Shelton v. Restaurant.com, Inc., "[i]n short, words make a difference. We must assume that the Legislature purposely included every word, and we must strive to give every word its logical effect." 214 N.J. 419, 441 (2013). But just as reviewing courts should not ignore the words the Legislature chose to include in a statute, nor should they add language the Legislature chose not to include. It is inappropriate for "[a] court . . . [to]

rewrite a plainly[]written enactment of the Legislature [or to] presume that the Legislature intended something other than that expressed by way of the plain language." J.V., 242 N.J. at 443 (third alteration in original) (quoting O'Connell v. State, 171 N.J. 484, 488 (2002)). Accordingly, we have no authority to add a prerequisite to immunity not imposed by the plain language of the OPA. Further, only "[i]f . . . the statutory text is ambiguous, [can courts] resort to 'extrinsic interpretative aids, including legislative history,' to determine the statute's meaning." Ibid. (quoting S.B., 230 N.J. at 68.).

III.

Turning specifically to the OPA, the Legislature set forth its goals and objectives in a declaration of policy and findings, which we consider to be part of the Act's plain text, and not an "extrinsic" interpretive aid. Specifically, N.J.S.A. 24:6J-2 states:

> The Legislature finds and declares that encouraging people who witness or experience a suspected drug overdose to seek medical assistance saves lives and is in the best interests of the citizens of this State and, in instances where evidence was obtained as a result of seeking of medical assistance, those people who witness or experience a suspected drug overdose should be protected from arrest, charge, prosecution, conviction, and revocation of parole or probation for possession or use of illegal drugs or drug paraphernalia. Additionally, naloxone is a safe, inexpensive, and easily administered antidote to an opioid overdose. Encouraging the wider prescription and distribution of naloxone or similarly acting drugs

13

to those at risk for an opioid overdose, or to members of their families or peers, would reduce the number of opioid overdose deaths and be in the best interests of the citizens of this State. To that end, it is the intent of the Legislature that opioid antidotes be made as easily accessible and as widely available as possible, such that they are readily available at all times to provide treatment to people experiencing a suspected opioid overdose. It is not the intent of the Legislature to protect individuals from arrest, prosecution or conviction for other criminal offenses, including engaging in drug trafficking, nor is it the intent of the Legislature to in any way modify or restrict the current duty and authority of law enforcement and emergency responders at the scene of a medical emergency or a crime scene, including the authority to investigate and secure the scene.

This is not the first time we have construed the OPA. In W.S.B., 453 N.J. Super. at 222, Judge Jack M. Sabatino provided a thoughtful and comprehensive overview of the Act's key provisions, as well as its legislative history. We now add to that foundation, addressing a fact-sensitive question of statutory interpretation not directly discussed in W.S.B.

The OPA confers immunity on two categories of qualifying persons: (1) those "who, in good faith, seek[] medical assistance for someone experiencing a drug overdose" and (2) those "who experience a drug overdose and who seek[] medical assistance or [are] the subject of a good faith request for medical assistance." N.J.S.A. 2C:35-30; N.J.S.A. 2C:35-31. The present case involves the second category, and specifically, the variation in which the

person claiming immunity is the subject of a request for medical assistance made by another.

In W.S.B., we held that a person claiming immunity shoulders the burden of proof by a preponderance of the evidence. 453 N.J. Super. at 232-33. Defendant does not dispute that she bears the burden of persuasion.

Furthermore, as we have already noted, OPA immunity applies only to several specifically-enumerated drug-related offenses, including N.J.S.A. 2C:35-10, the "simple" possession offense defendant is presently charged with. The limited reach of immunity is important to our interpretation of the Act's plain text because the strict limitation on what crimes may be excused stands in stark contrast to the broad statutory language used to determine whether a defendant is shielded from arrest and prosecution for an enumerated crime. Stated another way, immunity is granted liberally under the Act, but only to excuse personal use drug offenses. This reflects the Legislature's policy determination that the need to save lives by encouraging medical assistance calls in potentially life-threatening situations outweighs the need to prosecute comparatively minor drug offenses. To put the present prosecution in context with that legislative policy, we note the certified laboratory report indicates the methamphetamine found in defendant's wallet weighed 2.322 grams (0.082 ounces).

A-3637-23

IV.

In determining the scope of a statute's intended reach, that is, its "overall meaning," see Miah v. Ahmed, 179 N.J. 511, 521 (2004) (quoting Chasin v. Montclair State Univ., 159 N.J. 418, 427 (1999)), we pay special attention to statutory definitions. When the Legislature chooses to define a term used throughout a statute, that definition takes precedence over the common and ordinary meaning of that term. Thus, to the extent a statutory definition is either broader or narrower than a term's common understanding, the statutory definitional language governs.

This case hinges on whether defendant was experiencing a "drug overdose" within the meaning of the OPA when R.S. placed the 911 call. The statutory definition of that term is thus critical to our analysis. The OPA defines drug overdose as:

> [A]n acute condition including, but not limited to, physical illness, coma, mania, hysteria, diminished consciousness, respiratory depression, or death resulting from the consumption or use of a [CDS] or another substance with which a [CDS] was combined and that a layperson would reasonably believe to require medical assistance.
>
> [N.J.S.A. 24:6J-3.]

In W.S.B., we commented that the Act's definition of "drug overdose" is broad. 453 N.J. Super. at 221. We also remarked that the definition is "rather

lengthy," id. at 226, and that the Legislature "crafted the definition of a drug overdose within the OPA rather carefully," id. at 229.

The definition is comprised of three elements, all of which must be established to qualify for immunity: (1) the person must exhibit an "acute condition[,]" (2) "the acute condition must be 'resulting from the consumption or use of a [CDS] or another substance with which a [CDS] was combined[,]'" and (3) "the acute condition must be one 'that a layperson would reasonably believe to require medical assistance.'" Id. at 226-27 (second alteration in original). We next consider each of these distinct elements.

Acute Condition

As to the "acute condition" element, the OPA provides a non-exhaustive list of qualifying conditions, "including, but not limited to, physical illness, coma, mania, hysteria, diminished consciousness, respiratory depression, or death resulting from the consumption or use of [CDS] . . . ." N.J.S.A. 24:6J-3. The inclusion of "mania" and "hysteria," when juxtaposed with "physical illness," support our conclusion that an acute condition is not limited to a physical toxic reaction to CDS consumption such as "coma" or "respiratory depression." Rather, by including "mania" and "hysteria" in the list, the Legislature made clear that an acute condition can also present in the form of mental health-related and behavioral symptoms.

17

While not specifically mentioned in the non-exhaustive list of acute conditions, we view suicidal ideation to be similar in nature to mania and hysteria as these conditions all involve behavioral responses to CDS use—not just physiological reactions to toxins. We thus conclude that nothing in the statutory definition of acute condition suggests the Legislature meant to exclude suicidal ideation. Cf. Hovbilt, Inc. v. Township of Howell, 263 N.J. Super. 567, 571 (App. Div. 1993) (explaining that, under the principle of ejusdem generis, "when general words follow specific words in a statutory enumeration, the general words are construed to embrace only the objects similar in nature to those objects enumerated by the preceding specific words[,]" which "saves the [L]egislature from spelling out in advance every contingency in which the statute could apply").

Further, in W.S.B., we noted that "the adjective 'acute' connotes severity[;] . . . '[t]he condition cannot be mild or inconsequential.'" 453 N.J. Super. at 227 (citing Stedman's Medical Dictionary 23 (28th ed. 2006)). Certainly, an impending suicide constitutes a severe situation, as it definitionally encompasses the risk of death. In any event, we need not further elaborate on the first element because the State acknowledged at oral argument that R.S. was reporting an acute condition when he placed the 911 call. We

18                                                          A-3637-23

therefore conclude defendant has established the first element of the three-part definition of drug overdose.

## Medical Assistance

We momentarily put off our consideration of the second element, relating to causation, and address the third element which focuses on whether the acute condition requires "medical assistance." The OPA defines medical assistance as "professional medical services that are provided to a person experiencing a drug overdose by a health care practitioner, acting within the practitioner's scope of professional practice, including professional medical services that are mobilized through telephone contact with the 911 telephone emergency service." N.J.S.A. 24:6J-3.

We are satisfied that R.S.'s 911 call was for medical assistance within the meaning of the OPA. Defendant was transported to a hospital as a direct result of R.S.'s request for a well-being check. We do not believe immunity is foreclosed in this case because the assistance sought focused principally on a psychiatric/mental health evaluation. We reject the notion that a mental health crisis intervention is categorically excluded from the ambit of medical assistance under the OPA, especially when, as here, the patient is transported to a hospital. To hold otherwise would suggest that psychiatry is not a branch of the medical profession, or that the CRMC staff who evaluated and treated

19 <span>A-3637-23</span>

defendant, including two ED physicians, were not "health care practitioner[s], acting within the practitioner's scope of professional practice." N.J.S.A. 24:6J-3. The Act broadly defines "[h]ealth care practitioner" to mean "any individual who is licensed or certified to provide health care services pursuant to Title 45 of the Revised Statutes." Ibid. That Title encompasses a wide spectrum of health care specialties, including the licensing of psychiatrists and other professionals who diagnose and treat psychiatric disorders. See, e.g. N.J.S.A. 45:1-34. If the Legislature had meant to categorically exclude psychiatric disorders from the scope of OPA immunity, it would have said so and would not have defined the term health care practitioner so broadly.

We add that the third element of the term drug overdose must be applied in the context of the 911 caller's perspective. In W.S.B., we noted that "[b]y choosing to define the immunity in terms of the perception of a layperson . . . the Legislature made clear that it did not want laypersons, when they request medical assistance for someone who seems to be overdosing, to be held to rigorous standards of an expert's superior knowledge." 453 N.J. Super. at 227-28. Applying that principle, we are satisfied that R.S. was acting out of concern for defendant's life and without thinking whether the police response to his 911 call might later be characterized as something other than a request for "medical" assistance. We are doubtful that R.S. or any layperson in this

20

situation would draw a distinction between medical assistance and psychiatric assistance.

In W.S.B., we further added that the call for medical assistance must be made in "good faith" and cannot be "fanciful" or "far-fetched." Id. at 228-29. The court cautioned, for example, that "a 'bad faith' pretextual attempt to exploit the OPA's immunity by taking an illegal drug possessor who is fearful of being prosecuted to a hospital emergency room, even though he or she does not genuinely appear to be acutely ill, will not succeed." Id. at 229. We explained the call for medical help "must reasonably appear to be 'required' under the circumstances presented." Id. at 228.

On this record, we see no indication of willful pretext or an attempt to manipulate the 911 system to shield defendant from arrest and prosecution. The State nonetheless contends that R.S. was not a "good faith third-party call[er] for medical assistance to prevent drug overdose" because he was not with defendant when he called, did not state to the 911 operator defendant was overdosing, and did not call until an hour after he last heard from her. We are not persuaded by any of these arguments.

Although the Act's declaration of policy and findings refers to people who "witness" a suspected drug overdose, N.J.S.A. 24:6J-2, we do not interpret that description to require the 911 caller be physically present with

the overdose subject. The plain language of the OPA's operative provisions includes no such requirement. Given the ultimate legislative goal is to save lives, we are satisfied the caller can "witness" an overdose subject's acute condition through telecommunication. We are also satisfied that police can rely on the 911 caller's report concerning the overdose subject that is based on personal knowledge obtained via telecommunication. Cf. State v. Golotta, 178 N.J. 205, 221-22 (2003) (holding that, in the context of a search-and-seizure question, an anonymous 911 call is more reliable than anonymous tips given to police by other means, and will justify an investigative detention if it conveys an "unmistakable sense that the caller has witnessed an ongoing offense that implicates a risk of imminent death or serious injury").

In this case, the fact that R.S. was not physically present with defendant when he called 911 did not diminish the reliability of his call to police. Furthermore, R.S. provided his name and current address. We add that R.S. was in direct communication with defendant via text message. He thus was aware of her acute condition in real time but was unable to render direct aid to her and instead needed to rely on first responders.

It is immaterial, moreover, that since R.S. was at a different location from defendant, he was not personally at risk of being arrested for a drug offense when he asked to have police dispatched to check on defendant. The

22

purported overdose subject—not the caller—is seeking immunity.  See N.J.S.A. 2C:35-30.

The State's argument that R.S. did not explicitly state that defendant was "overdosing" begs the question as to what constitutes an overdose—an issue we address in the next subsection.  We hold that eligibility for OPA immunity does not depend on the caller using any particular phrase or label to characterize the acute condition.  What matters, rather, are the objective facts conveyed to the 911 operator.

Here, it is not disputed that R.S. reported defendant uses methamphetamine.  That suggests he believed defendant's substance use was relevant to the circumstances compelling a police well-being check and something that responding officers should know.  The question before us is whether the fact R.S. relayed defendant's past substance use to police established that he believed the mental health crisis defendant was experiencing resulted from her methamphetamine use.  In answering that critical question, we emphasize that under the OPA, we do not hold a 911 caller to the "rigorous standards of an expert's superior knowledge" regarding, in this instance, the relationship between CDS use and the acute condition prompting the call.  W.S.B., 453 N.J. Super. at 227-28.

Further, we hold defendant is not disqualified for immunity because R.S. delayed an hour in calling for medical assistance. The whole point of the immunity provision is to provide incentive to call police for help by ameliorating a potential disincentive—the fear of a resultant arrest. That goal presupposes that a call for police intervention will be made after deliberating on its benefits and risks.

In this instance, moreover, the fact that text messaging between defendant and R.S. had ended may have amplified, not assuaged, his concern that she was poised to act upon her suicidal statements. Nothing in this record suggests that the need for a mental health crisis intervention had passed before R.S. mustered the will to call for police assistance. We add that R.S. ultimately reported on defendant's acute condition via the 911 system—a method for communicating with police that is reserved for perceived emergencies.

While time is of the essence in responding to a drug overdose, we are satisfied that in these unusual circumstances, the OPA embraces a "better late than never" approach to calls for medical assistance. Certainly, the Act does not prescribe a time limit for calling for assistance after which the right to immunity lapses, especially when the person experiencing the overdose is not the one calling 911. It seems inconsistent with the OPA's remedial nature—

24

and fundamentally unfair—to interpret the Act in a manner that would deny immunity to a purported overdose subject who has no control over when the 911 call is placed. We thus hold that defendant is not disqualified from immunity simply because R.S. could have placed the 911 call sooner. Accordingly, we conclude defendant established the third element.

Causation

We turn back to the second definitional element pertaining to the causal relationship between CDS use and the acute condition that prompts a 911 call. Although the OPA's immunity feature should be applied liberally to achieve its life-saving objective, we emphasize it is not enough that thoughts of suicide occur coincidentally with CDS consumption. The OPA is not a suicide prevention act per se. Nor is it inapplicable merely because the acute condition is the risk of death caused by suicidal ideation or attempts, instead of by an accidental and unexpected toxic reaction to an excess dose of CDS. Nothing in the OPA's plain text limits its scope to accidental overdoses. Nor does the Act's plain language require that an intentional suicide be accomplished by ingesting a lethal dose of CDS, although that situation would, of course, fall within the Act's scope.

In testing the boundaries of a statute, it is sometimes helpful to consider circumstances that fall outside the heartland of its coverage. In W.S.B., for

example, we commented on the causation element by posing hypothetical scenarios that would not qualify for immunity. 453 N.J. Super. at 227. We stated, "a person possessing narcotics who appears to be acutely ill from a knife wound, a burst appendix, or a fracture would not trigger the immunity." Ibid. We added, "[n]or would a drug user or possessor who has consumed CDS in the past, but who is now experiencing an acute condition perceived to result from another cause." Ibid. (emphasis added).

We do not read the latter observation as categorically precluding immunity when the acute condition results from past, as opposed to immediate, CDS use. On the contrary, W.S.B. made clear that "the broad definition of a 'drug overdose' that the Legislature chose to adopt in N.J.S.A. 24:6J-3 does not turn on concepts of 'intoxication.'" Id. at 221.

Relatedly, the Act does not require proof that the overdose subject is "under the influence" of a CDS. Presumably, the Legislature was familiar with that phrase because it appears in the very offense with which defendant is charged—a charge specifically enumerated in the OPA as a crime subject to immunity. N.J.S.A. 2C:35-30(a)(1). Indeed, the Act carefully and precisely explains that someone experiencing a drug overdose "shall not be . . . arrested, charged, prosecuted or convicted for obtaining, possessing, using, being under the influence of, or failing to make lawful disposition of, a [CDS] or controlled

26

substance analog pursuant to subsection a., b., or c. of N.J.S.[A.] 2C:35-10." Ibid. (emphasis added). Aside from showing that the Legislature knew how to refer to the state of being under the influence, this formulation of the OPA affirms that a person can qualify for immunity when charged with a violation of N.J.S.A. 2C:35-10 based on "possessing" a CDS without also being alleged to have been "under the influence" of that CDS.

The fact that the definition of "drug overdose" does not require proof that an overdose subject is presently under the influence of a CDS is both conspicuous and telling. We also presume the Legislature carefully considered what <u>not</u> to include in the definition of "drug overdose" that might restrict its intended ambit. Cf. DiProspero, 183 N.J. at 495 (quoting Brodsky v. Grinnell Haulers, Inc., 181 N.J. 102, 112 (2004)) ("The canon of statutory construction, expressio unius est exclusio alterius—expression of one thing suggests the exclusion of another left unmentioned—sheds some light on the interpretative analysis."). The OPA's definition of "drug overdose" strikes us as a carefully worded term intended to broaden its common and ordinary meaning and, in this instance, did so by not limiting its application to situations where the overdose subject is reacting adversely to the immediate ingestion of an excessive dose of CDS.

It also bears noting that much of the OPA concerns promoting and facilitating the use of the opioid antidote naloxone to respond to heroin, fentanyl, and other opiate-induced overdoses. The immunity provision must be read in context with the other provisions in the Act. See DiProspero, 183 N.J. at 477 (holding that statutory language should be "read [] in context with related provisions so as to give sense to the legislation as a whole"). Tellingly, nothing in the OPA suggests that the immunity provision is limited to situations where naloxone or some other antidote is used. If the Legislature intended to limit immunity to cases where that kind of intervention is needed, it would have said so. As we noted in our discussion of what constitutes an "acute condition," the Legislature by no means limited OPA immunity to situations involving coma or respiratory depression.

Additionally, we know that the Legislature is aware of the devastating long-term effects of drug or alcohol dependency. See N.J.S.A. 2C:35-14 (authorizing treatment in lieu of imprisonment in certain circumstances). Cf. State v. Clarke, 203 N.J. 166, 181 (2010) (quoting S. L. & Pub. Safety Comm. Statement to S. 1253 (Jan. 25, 1999)) (supporting the proposition that "the disease of drug or alcohol dependence is a chronic, relapsing disorder"). N.J.S.A. 2C:35-14(a)(2) refers explicitly to persons who have a "substance use disorder," which is defined as:

A-3637-23

[A] person who as a result of using a [CDS] or controlled substance analog or alcohol has been in a state of psychic or physical dependence, or both, arising from the use of that [CDS] or controlled substance analog or alcohol <u>on a continuous or repetitive basis</u>. Substance use disorder is characterized by behavioral and other responses, including, but not limited to, a strong compulsion to take the substance on a recurring basis in order to experience its psychic effects, or to avoid the discomfort of its absence.

[N.J.S.A. 2C:35-2 (emphasis added).]

Relatedly, we presume the Legislature in adopting the OPA was well aware of the relationship between substance use and mental health disorders—including depression and suicidal ideations—which are sometimes co-occurring. Our State's nationally acclaimed Recovery Court program,[7] is a testament to our State's commitment to saving lives by providing long-term rehabilitation opportunities to address an offender's long-term substance use problems, "combat[ting] the hopelessness of addiction with the hopefulness of treatment." <u>State v. Harris</u>, 466 N.J. Super. 502, 510 (App. Div. 2021). The OPA likewise falls into the category of a hopeful statute—one that recognizes that criminal prosecution does not always advance the goal of mitigating the harms associated with CDS.

---

[7] The program was formerly called the Drug Court program.

We reiterate and stress that given the OPA's explicit focus on what a "layperson would reasonably believe to require medical assistance," N.J.S.A. 24:6J-3, we cannot expect, much less require, a potential 911 caller to perform a diagnostic assessment to determine whether and to what extent a subject's acute condition is the result of a mental health disorder rather than a substance use disorder.  See N.J.S.A. 2C:35-14(a)(1) (requiring a "professional diagnostic assessment to determine whether and to what extent the person [seeking special probation in lieu of imprisonment] has a substance use disorder and would benefit from treatment"); see also W.S.B., 453 N.J. Super. at 228 (noting that a layperson cannot be held to the "rigorous standards of an expert's superior knowledge").  As we also noted in W.S.B., the OPA "aims to incentivize third parties who perceive another individual's apparent overdose, or who think they are personally suffering one, to err on the side of caution and get immediate medical help."  Ibid.

## V.

Applying the foregoing principles to the matter before us, we are concerned that the trial court misperceived the OPA's causation requirement when it found that the acute condition was not "drug related."  The court appears to have assumed that the OPA requires proof defendant was under the influence of a CDS when she was taken to the hospital.  It highlighted, for

30

example, the CRMC "drugs of abuse" test was cancelled, suggesting that the hospital staff did not believe defendant was under the influence of methamphetamine or any other CDS.

Relatedly, the trial court noted the fact that police called for an emergency psychiatric screener, rather than EMS, shows responding police believed defendant was experiencing a psychiatric disorder, not a drug overdose. The court's finding that defendant's suicidal behavior was attributable to a psychiatric disorder is well-supported, however, this discounts the possibility that she also was suffering the effects of a co-occurring substance use disorder. In sum, the trial court embraced an interpretation of "drug overdose" that may be consistent with the common and ordinary meaning of the term, but is narrower than the Legislature's broad definition in the OPA.

In these circumstances, we deem it necessary to remand for a new hearing focusing specifically on whether defendant can prove the causation element, that is, whether a layperson in R.S.'s position would have believed defendant's acute condition resulted from her CDS use. We take no position on whether the causation element is satisfied in this case, and offer the following remand instructions and comments.

31

Defendant shall be afforded an opportunity, if she chooses, to present additional evidence on the causation question, which may include but need not be limited to testimony from R.S. While we ordinarily would be reluctant to allow a party to expand the record on remand to meet its burden of persuasion, we note that in this instance, the State acknowledges in its appeal brief that under the OPA, "defendants in [C.C.W.]'s position get a 'second bite at the apple' on the OPA immunity question at trial." See W.S.B., 453 N.J. Super. at 238 (holding "the defense [] must be afforded a final opportunity at trial to persuade a jury as the ultimate fact-finder . . . and marshal further proofs and arguments on the [immunity] subject"). Mindful that the concept of causation can be challenging to explain to a jury,[8] we deem it prudent to afford the trial court and parties an opportunity to resolve the causation issue at an in limine hearing rather than broach this fact-sensitive question for the first time at a jury trial at which additional evidence is presented.

---

[8] In accordance with the recommendation in W.S.B., 453 N.J. Super. at 233, n.7, the Model Criminal Jury Charge Committee drafted model instructions explaining immunity under the OPA. See Model Jury Charges (Criminal), "OVERDOSE PREVENTION ACT DEFENDANT SUBJECT OF CALL FOR ASSISTANCE (N.J.S.A. 2C:35-31)" (approved Mar. 11, 2019). The model charge does not amplify the statutory text of the OPA with respect to causation.

Further, defendant shall be permitted to present expert testimony on the question of causation, provided, of course, the expert(s) are properly qualified under N.J.R.E. 702. We acknowledge that the W.S.B. court noted:

> Expert knowledge by the party who pursues medical assistance therefore is not required to trigger the OPA's immunity. Nor is such expert knowledge dispositive. The pertinent inquiry is not what an expert would conclude about the subject's condition. Rather, the nature and urgency of the situation is to be viewed through the eyes of an average person.
>
> [453 N.J. Super. at 228.]

That does not mean, however, that defendant is categorically precluded from presenting expert testimony generally explaining any possible relationship between chronic substance use and suicidal ideation as well as specifically considering any information R.S. knew about defendant's history of substance use and suicidal ideation.

The State also acknowledged at oral argument that defendant may present expert testimony at trial regarding the causal nexus between defendant's CDS use and the acute condition prompting R.S.'s 911 call. We see no reason why evidence pertaining to immunity that might be introduced at trial may not also be presented at the remand hearing. Similarly, the State at the remand hearing may present expert testimony to support its position that

33

defendant's suicidal thoughts were not the result of CDS use within the meaning of the OPA.

Finally, we reiterate that under the OPA, as interpreted in W.S.B., 453 N.J. Super. at 232-33, defendant bears the burden of establishing the grounds for immunity by a preponderance of the evidence. As we have explained, we are satisfied she has already met that burden with respect to two of the three elements of the definition of "drug overdose." It remains for her to prove that a lay person in R.S.'s position would believe defendant's suicidal ideations were the result of her substance use, applying the "err on the side of caution" approach recognized in W.S.B., id. at 228.

If the trial court on remand determines that OPA immunity applies, the indictment shall be dismissed, subject to the State's right of appeal. If the court concludes on remand that defendant does not qualify for immunity, the defense shall be afforded a final opportunity at trial to persuade a jury as the ultimate fact-finder.

Remanded for proceedings consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division